Stephen A. FAUSEL, Appellant,

v.

JRJ ENTERPRISES, INC. f/k/a Bloomfield Speedway, Inc., Appellee.

No. 98–948.

Supreme Court of Iowa.

Dec. 22, 1999.

**614**

Jason W. Sapsin and Gene R. Krekel of Hirsch, Adams, Krekel, Putnam, Cahill & Miller, Burlington, for appellant.

Patrick M. Roby and Christopher L. Bruns of Elderkin & Pirnie, P.L.C., Cedar Rapids, for appellee.

Considered by LARSON, P.J., and LAVORATO, SNELL, CADY, and HARRIS,* JJ.

LAVORATO, Justice.

Stephen Fausel sued JRJ Enterprises, Inc. for anticipatory breach of contract. Fausel had agreed in writing to purchase JRJ's membership interest in an entity involved in a Colorado casino operation. Following a bench trial, the district court dismissed Fausel's suit. Fausel appealed, contending, among other things, that the district court (1) misconstrued the agreement as requiring him to perform by July 31, 1995, and (2) erroneously concluded that two provisions of the Restatement (Second) of Contracts barred his claim of anticipatory breach. We agree and reverse and remand with directions.

## I. Background Facts and Proceedings.

John R. Johnson is a resident of West Burlington, Iowa. His business interests include construction, steel erection, ready mix, and rock quarry. He is also the sole shareholder and officer of JRJ Enterprises, Inc., formerly known as Bloomfield Speedway, Inc. JRJ is a subchapter "S" corporation that manages several car racing tracks in Iowa.

In October 1992, Hawkeye Gaming Ventures Limited Liability Company was organized under the Wyoming Limited Liability Company Act. According to its articles of organization, Hawkeye's purpose was to engage "in the business of constructing, developing and operating a casino in Gilpin County, Colorado." The articles listed five initial members and stated that an executive management committee comprised of three individuals—John Randall Winegard, Larry W. Rheinschmidt, and Patrick A. Haney—were to manage Hawkeye. The articles allowed for the admission of additional members upon unanimous consent of the original members and "subject to the terms and conditions of the Company's Operating Agreement."

Shortly after the formation of Hawkeye, a private offering memorandum concerning Hawkeye was circulated to potential investors. The memorandum stated that part of the proceeds from the sale of membership units in Hawkeye would be contributed to 101 Main Street Limited Liability Company, a Wyoming limited liability company. The memorandum further stated that Hawkeye owned fifty percent of the membership units in 101 Main Street and Main Street Gaming House Partners, L.P., a Colorado limited partnership, owned the other fifty percent. According to the memorandum, 101 Main Street had been organized to develop and operate a casino in Black Hawk, Colorado, which was expected to open June 1, 1993.

At about this time, Winegard and Rheinschmidt approached Johnson about investing in Hawkeye. Johnson committed to invest $875,000 in Hawkeye. In February 1993, an amendment to the offering memorandum was circulated stating that the plans for the casino were changing: the casino would offer fewer slot ma-

---

* Senior judge assigned by order pursuant to Iowa Code section 602.9206 (1999).

chines and would scale back customer parking facilities. Because of these changes, Johnson began expressing concerns about the project. He also felt he was not being compensated for his commitment to invest $875,000. Consequently, Johnson held back his investment, an action that brought construction of the casino to a halt. Johnson eventually made the $875,000 investment through his company, JRJ. He followed that with an additional $200,000 investment, for a total investment of $1,075,000, making JRJ Hawkeye's single largest investor.

By June 1994, Johnson became concerned about his investment for several reasons. Construction of the casino was not on schedule, he had to personally guarantee debt so that additional financing for the casino could be obtained, and he had a perception that he had inadequate influence over decisions concerning the casino. These concerns culminated in a letter dated September 8 to Patrick Haney, secretary/treasurer of Hawkeye, in which Johnson stated he wanted to sell his interest in Hawkeye for the amount of his investment: $1,075,000.

Article 10 of Hawkeye's operating agreement provided that, before a member could sell its interest in Hawkeye, the member had to get written consent from two-thirds of the remaining members or allow Hawkeye or the remaining members a right to match any bona fide offer. According to section 10.1, the bona fide offer had to be accompanied by ten percent of the purchase price.

After receiving Johnson's September 8 letter, Haney wrote a letter to Stephen A. Fausel, a potential purchaser. The letter outlined the potential return Fausel might enjoy if he purchased Johnson's interest in Hawkeye. On October 25 Fausel responded with a letter to Johnson outlining an agreement for the purchase of Johnson's interest in Hawkeye. The letter was followed by a document captioned "Agreement for Sale of Stock," (Stock Agreement) signed by Fausel on October 28 and

by Johnson on behalf of JRJ on October 31.

The following were the salient points of the Stock Agreement: (1) The purchase price was $1,075,000, payable upon the transfer of JRJ's membership units, with the transfer to take place within ten days of the determination of Fausel's suitability by the Colorado Gaming Division (settlement date); (2) no interest would accrue on the purchase price between the agreement date and the settlement date; and (3) JRJ warranted, among other things, that its units of ownership in Hawkeye were not subject to any restrictions on transferability "except as set forth in the articles of organization and the operating agreement of [Hawkeye]."

In addition, the Stock Agreement provided that Fausel's obligation to purchase was subject to several conditions precedent, three of which are pertinent here: (1) The Colorado Division of Gaming and the Colorado Bureau of Investigation had to approve Fausel without reservation, (2) Hawkeye had to approve transfer of JRJ's units, and (3) Hawkeye had to approve Fausel as a substitute member with full rights of participation in the management of the business and affairs of Hawkeye.

■ The requirement that Fausel be approved by the Colorado Division of Gaming was apparently rooted in Colorado statutory and regulatory law. Under the Colorado Limited Gaming Act, gaming licenses are issued by the Colorado Division of Gaming. Colo.Rev.Stat.Ann. § 12–47.1–202 (West 1999); *Moya v. Colorado Ltd. Gaming Control Comm'n,* 870 P.2d 620, 622 (Colo.Ct.App.1994). Any person or entity wishing to hold an ownership interest in a gaming license is subject to investigation and approval by the Colorado Division of Gaming. *See* Colo.Rev.Stat.Ann. § 12–47.1–201 to –204; *Moya,* 870 P.2d at 622. The approval requirement applies not only to those who wish to directly hold a license, but also to those who own more than a five percent share of the beneficial

interest in companies seeking licenses. *See In re Aristocrat, Inc.*, 973 P.2d 727, 730 (Colo.Ct.App.1999). Therefore, although 101 Main Street actually held the gaming license, Hawkeye, and in turn Hawkeye's owners, were subject to approval by the Colorado Division of Gaming.

Although the record is not entirely clear as to exact ownership percentages, it does appear that Hawkeye owned more than five percent of 101 Main Street and that JRJ owned more than five percent of Hawkeye. As a prospective ultimate owner of a gambling casino in Colorado, Fausel was therefore required to get approval from the Colorado Division of Gaming.

By contrast, approval by Hawkeye was governed by the articles of organization. Pursuant to section 10.1, Fausel's offer would not be considered a bona fide offer unless it included a ten percent down payment. Furthermore, sections 10.1 and 10.2 of Hawkeye's operating agreement required JRJ to give notice of Fausel's offer to Hawkeye and the remaining members. Section 10.3 provided that, if Hawkeye failed to accept the offer within ten days, the remaining members would have ten days to do so. Section 10.4 provided that, if neither Hawkeye nor the remaining members chose to match the offer, JRJ could complete the sale provided three conditions were met: (1) the sale had to be on the terms offered in the notice, (2) the purchaser had to sign the operating agreement, and (3) the sale had to close within thirty days of the time allowed for Hawkeye or the remaining members to match the offer.

If the sale was not closed within the thirty days, section 10.4 provided that JRJ's membership interest would again be subject to all the restrictions of sections 10.1, 10.2, 10.3, and 10.4. Therefore, the deadline for completing the sale and avoiding resubmission of JRJ's interest to Hawkeye and the remaining members would have been approximately mid-December 1994.

Though Fausel did not forward the ten percent down payment as required by section 10.1, Hawkeye and the remaining members nevertheless considered his offer as a bona fide offer. Hawkeye and the remaining members subsequently declined to purchase JRJ's membership interest. Consequently, JRJ was free to sell its interest to Fausel. The remaining members additionally agreed to waive the thirty-day closing requirement in section 10.4. Instead, they gave JRJ until July 31, 1995, to close the sale to Fausel.

At about the time JRJ and Fausel signed the Stock Agreement, two other events were taking place. A casino management enterprise known as "Fitzgerald's" took an option to buy all ownership interests in 101 Main Street, including those of Hawkeye. Fitzgerald's was to operate the casino. Another investment entity known as "Dry Gulch," partly owned by Hawkeye, agreed to purchase an interest in 101 Main Street. All three of these transactions—Fausel's purchase of JRJ's interest in Hawkeye, Fitzgerald's' purchase of all ownership interests in 101 Main Street, and Dry Gulch's purchase of an interest in 101 Main Street—required approval of the Colorado Division of Gaming.

Shortly after signing the Stock Agreement, Fausel hired a CPA firm to prepare his application for approval to the Colorado Division of Gaming. The application reached the Division of Gaming in February 1995. The applications of Fitzgerald's and Dry Gulch reached the Division of Gaming at about the same time. It was at this point that Fausel's application ran into difficulty. Charles Jacobs, attorney for 101 Main Street, asked the Division of Gaming to put Fausel's gaming application "on hold" and to proceed with the applications from Fitzgerald's and Dry Gulch. The Division of Gaming honored Jacobs' request so that between March and July 1995 nothing was done on Fausel's application. Fausel was unaware of the hold until June 9, 1995. The Division of Gaming

ultimately approved the applications from Fitzgerald's and Dry Gulch in November 1995.

On May 23, 1995, the casino opened for business. On June 12, 1995, JRJ sent Fausel a letter allegedly canceling their Stock Agreement. JRJ stated as the basis for the cancellation that Fausel had failed to get approval of the Colorado Division of Gaming in a "reasonable and timely manner." Fausel eventually withdrew his application with the Division of Gaming.

Later, Fausel sued JRJ for anticipatory breach of contract. In one count, Fausel asked for damages, and in the other count he asked for specific performance.

The parties tried the case to the district court. The district court did not reach Fausel's claim that JRJ, by its June 12 letter, had anticipatorily breached the Stock Agreement. Rather, the court found the deadline for performance of the agreement was July 31, 1995, and that, as of June 12, 1995, Fausel had not and could not get approval from the Colorado Division of Gaming by July 31, 1995. The court concluded Fausel had not fulfilled his obligations under the agreement and dismissed Fausel's suit.

The district court also concluded the case should be dismissed under Restatement (Second) of Contracts, sections 181 and 254.

Fausel appealed, contending that the district court erred in dismissing his claim of anticipatory breach. Fausel argues that the district court erroneously concluded that the Stock Agreement required performance by July 31, 1995. He also argues the court erroneously concluded that his claim was barred under sections 181 and 254 of the Restatement (Second) of Contracts.

## II. Scope of Review.

■ The parties tried this case as a law action. Our review is therefore for correction of errors at law. Iowa R.App.P. 4; *Bacon v. Bacon*, 567 N.W.2d 414, 417

(Iowa 1997) (noting our review is in accordance with mode of trial in district court). Additionally, to the extent this appeal concerns matters of contract construction, our review is at law. *See Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 25 (Iowa 1978) ("[Contract] [c]onstruction is always reviewed as a law issue.").

■ The district court's findings of fact are binding on us if they are supported by substantial evidence. *See* Iowa R.App.P. 14(f)(1). However, we are not bound by the district court's legal conclusions, and we may inquire into whether the district court's ultimate conclusions were materially affected by improper conclusions of law. *Smith v. Bertram*, 603 N.W.2d 568 (Iowa 1999).

## III. Whether the District Court Erred in Dismissing the Claim for Anticipatory Breach.

■ **A. Did the district court err in construing the Stock Agreement as requiring performance by July 31, 1995?** The district court found that, as of June 12, 1995 (the date JRJ allegedly canceled the Stock Agreement), Fausel had not and could not secure approval of the Colorado Division of Gaming by July 31, 1995. The court therefore concluded Fausel had not and could not perform his obligations under the agreement and dismissed his claim for anticipatory breach.

Therefore, a major issue in this case is when performance was required. The district court concluded that the closing date set by Hawkeye's members—July 31, 1995—was that time. The district court was emphatic that July 31, 1995, "controls this suit."

Fausel insists this construction of the Stock Agreement is incorrect. According to Fausel, the time for performance was open-ended and for that reason he had a reasonable period of time to complete performance that was well beyond June 12,

1995. For that reason, Fausel argues, the district court should have decided this case on the basis of whether JRJ had anticipatorily breached the Stock Agreement by its June 12 letter of cancellation. For reasons that follow, we agree.

**1. Rules of interpretation.** At this point, our primary task is to determine when performance was required. This task requires us to review the district court's interpretation and construction of the Stock Agreement. Interpretation is a process for determining the meaning of words in a contract. *Fashion Fabrics,* 266 N.W.2d at 25. Construction, on the other hand, is a process of determining the legal effect of such words. *Id.*

We review a district court's interpretation as a legal issue unless that interpretation depended on extrinsic evidence. *Id.* Therefore, when the meaning of an agreement depends on extrinsic evidence, a question of interpretation is left to the trier of fact unless "the evidence is so clear that no reasonable person would determine the issue in any way but one." Restatement (Second) of Contracts § 212 cmt. e (1979). However, we always review construction as a legal issue. *Fashion Fabrics,* 266 N.W.2d at 25.

The Restatement (Second) of Contracts, section 202 provides rules to aid in the interpretation of contracts. Two such rules are pertinent here:

(1) Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight.

(2) A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.

These rules "do not depend upon any determination that there is an ambiguity, but are used in determining what meanings are reasonably possible as well as in choosing among possible meanings." Restatement (Second) of Contracts § 202 cmt. a.

There are cases that say extrinsic evidence cannot change the plain meaning of a writing. But as the Restatement points out, "meaning can almost never be plain except in a context." Restatement (Second) of Contracts § 212 cmt. b. Therefore, the rule that words and other conduct are interpreted in the light of all the circumstances is not limited to cases when ambiguity in the agreement exists. *Id.* Rather,

[a]ny determination of meaning or ambiguity should only be made in the light of relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. *But after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention .*

*Id.* (emphasis added) (citations omitted); *see also id.* § 209(1) ("An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement.")

**2. Analysis.** With these rules in mind, we turn to the language of the Stock Agreement that we think bears on when Fausel was to perform. That language provides:

Seller agrees to sell and Buyer agrees to purchase Seller's Units for the purchase price of One Million Seventy Five Thousand Dollars ($1,075,000) payable upon the transfer of Seller's Units, *which transfer shall be within ten (10) days of the determination of Buyer's suitability by the Colorado Gaming Division (the "Settlement Date"). Seller agrees that no interest will accrue on the purchase price between the date of this Agreement and the Settlement Date.*

(Emphasis added.)

Another provision of the Stock Agreement conditioned Fausel's obligation to

consummate the transaction contemplated by the Stock Agreement as follows:

> (a) The Colorado Gaming Division and the Colorado Bureau of Investigation shall have approved Buyer without reservation; and
>
> (b) The Company shall have approved the transfer of Seller's Units and the admission of Buyer as a substitute Member with full rights of participation in the management of the business and affairs of the Company. . . .

The Stock Agreement does not specifically state the date by which Fausel's obligation to perform must be completed. Rather, the agreement merely provides that JRJ was to transfer its membership units in Hawkeye to Fausel within ten days of Fausel's approval by the Colorado Division of Gaming, at which time Fausel was to pay the purchase price. Additionally, Fausel's obligation to perform would not arise *until* the above-mentioned two conditions precedent occurred. Therefore, the time for Fausel's performance appears to be open-ended.

When a contract fails to specify time for performance, the parties must perform within a reasonable time. *Smith v. Fort Madison Community Sch. Dist.*, 334 N.W.2d 701, 704 (Iowa 1983); 17A Am.Jur.2d *Contracts* § 479, at 497 (1991) ("Where there is no provision as to the time for performance, a reasonable time is implied."). Based solely on the words of the Stock Agreement, Fausel therefore had a reasonable period of time to obtain approval from the Colorado Division of Gaming.

The district court, however, did not determine what would be a reasonable time for performance. Rather, the court looked to Hawkeye's operating agreement for guidance. The court did so because, in the Stock Agreement, JRJ warranted its membership units were not subject to any restrictions on transferability "except as set forth in the Articles of Organization and Operating Agreement of the Company." The court correctly concluded that Hawk-

eye's restrictions on the transferability of JRJ's membership units were therefore incorporated in the Stock Agreement. The error the court made was in construing those restrictions.

As recalled, Hawkeye and the remaining members declined to purchase JRJ's membership interest and waived the thirty-day closing requirement in section 10.4 of Hawkeye's operating agreement. Additionally, the members gave JRJ until July 31, 1995, to close the sale to Fausel. If JRJ did not close the sale by then, JRJ's membership interest would again be subject to all of the restrictions on transferability in the operating agreement. That would mean JRJ would again have to tender Fausel's offer to Hawkeye and the remaining members for their approval with another opportunity for Hawkeye and the remaining members to exercise their rights of first refusal. Hawkeye and its members could then purchase JRJ's membership interest on the same terms as provided for in the Stock Agreement. Or they could again reject the offer and allow Fausel to purchase the stock.

This construction of the Stock Agreement follows from the following language in section 10.4 of the operating agreement: "If the Transferor shall fail to make such sale, transfer, encumbrance or other disposition within thirty (30) days following the expiration of the time provided in Section 10.3 for the election by the remaining Members, *the Transferor's Membership Interests shall then again become subject to all restrictions of this Agreement.*" (Emphasis added.)

The district court, however, did not construe July 31, 1995, as the deadline for JRJ to avoid a new tender of its membership interest to Hawkeye and the remaining members on the same terms as provided in the Stock Agreement. Rather, the district court construed July 31, 1995, as the final deadline for performance of the sale. Therefore, under the district court's analysis, the sale would have to be completed within ten days of Fausel's approval

by the Colorado Division of Gaming, but not later than July 31, 1995.

There is nothing in Hawkeye's operating agreement to support this construction. Nor is there anything in the members' waiver and extension of time to close that supports this construction. In addition, neither the Stock Agreement nor extrinsic evidence shows that the parties intended a cancellation of their agreement if the sale were not completed by July 31, 1995.

Significantly, Johnson testified he was not even aware of the July 31, 1995 extension until trial. The June 12 letter suggests Johnson believed there was no express time for performance in the Stock Agreement. The letter, for example, states the reason for the cancellation was Fausel's failure to obtain approval of the Division of Gaming in a "reasonable and timely manner." In addition, in its brief in support of its motion for summary judgment, its trial brief, and its appellate brief, JRJ has acknowledged that there was no express time for performance and that Fausel had a reasonable period of time to obtain such approval. JRJ, of course, argues that Fausel breached the reasonable-time condition. However, that issue is not before us because the district court did not decide the case on that theory. Fausel viewed ten days within Division of Gaming approval as the date the sale was to close, and he did not know how long approval would take when he signed the Stock Agreement.

What we are left with are the words of the Stock Agreement. The only stated time limit was that the agreement be performed within ten days of Fausel's approval by the Colorado Division of Gaming. Fausel's obtaining approval of the Colorado Division of Gaming was the act that would trigger the concluding performances of the parties: JRJ's transfer of its membership units and Fausel's payment of the purchase price ten days later. Properly construed, the Stock Agreement gave Fausel a reasonable time in which to obtain Division of Gaming approval.

The July 31 deadline for closing set by the remaining members of Hawkeye was irrelevant to Fausel's performance. The deadline, however, might affect JRJ's ability to perform, but that issue is not before us. Suffice it to say that the Stock Agreement expressly conditioned Fausel's obligation to perform on JRJ's ability to transfer its membership interest without restriction at the time called for in the Stock Agreement.

We therefore reject the district court's construction of the Stock Agreement that July 31, 1995, was the deadline for completion of the sale. Other than the ten-day requirement in the Stock Agreement, there is no specific time for, or date of, performance. We must reverse and remand to allow the district court to determine, based on the record already made, what would be a reasonable time for Fausel to obtain approval of the Colorado Division of Gaming. If the district court determines a reasonable time for such approval extended beyond June 12, 1995 (the date JRJ allegedly canceled the agreement), the district court must then determine the merits of Fausel's claim that JRJ's alleged cancellation was an anticipatory breach. *See* Restatement (Second) of Contracts § 253(1) (providing that, if an obligor repudiates a duty before the obligor has committed a breach by nonperformance and before the obligor has received all of the agreed exchange for it, the obligor's repudiation alone gives rise to a claim for damages for total breach); § 253(2) (providing that, when performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance). The Restatement uses the term "repudiation" in lieu of "anticipatory breach." *See* Restatement (Second) of Contracts § 253 cmt. c.

**B. Whether the district court erred in concluding that Fausel's claim was**

barred under sections 181 and 254 of the Restatement (Second) of Contracts. The district court also concluded that Fausel's failure to obtain approval from the Colorado Division of Gaming was "enough to warrant dismissal of this case under either of two legal theories. Restatement (Second) of Contracts § 181 (failure to comply with regulatory licensing requirements) and Restatement (Second) of Contracts § 254 (effect of subsequent events on duty to pay damages)."

**1. Restatement (Second) of Contracts section 181.** This provision provides:

If a party is prohibited from doing an act because of his failure to comply with a licensing, registration or similar requirement, a promise in consideration of his doing that act or of his promise to do it is unenforceable on grounds of public policy if

(a) the requirement has a regulatory purpose, and

(b) the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement.

Restatement (Second) of Contracts § 181.

■ As mentioned, the district court erroneously concluded that Fausel had until July 31, 1995, to obtain approval from the Colorado Division of Gaming or· the Stock Agreement would be unenforceable. This erroneous construction of the Stock Agreement led the court to find that, as of June 12, 1995 (the date JRJ allegedly canceled the contract), it was impossible for Fausel to obtain such approval by the deadline date. Therefore, the court apparently concluded that Restatement (Second) of Contracts section 181 provided additional authority to find the Stock Agreement unenforceable.

If on remand, the district court finds that Fausel had a reasonable period of time beyond June 12, 1995, to obtain approval from the Division of Gaming, we have determined that the court must then consider Fausel's claim that JRJ's alleged cancellation was an anticipatory breach. A finding that there was an anticipatory breach as of June 12, 1995, would preclude application of the Restatement (Second) of Contracts, section 181. The district court therefore erred in concluding that this provision barred Fausel's claim.

**2. Restatement (Second) of Contracts section 254.** This provision provides in part:

(1) A party's duty to pay damages for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise.

Restatement (Second) of Contracts § 254.

■ We think the district court's reliance on this provision was likewise influenced by its erroneous construction of the Stock Agreement that July 31, 1995, was the deadline for Fausel securing approval from the Division of Gaming. The court apparently assumed that, even had JRJ repudiated the contract as of June 12, 1995, Fausel would not have been able to perform because he could not have obtained approval from the Division of Gaming by July 31, 1995. Such inability on Fausel's part would thereby discharge JRJ's duty to pay damages because of its breach by repudiation.

If on remand the court determines that in fact JRJ repudiated the contract as of June 12, 1995, and that Fausel could have within a reasonable period of time thereafter obtained approval from the Division of Gaming, then this provision of the Restatement (Second) of Contracts would not bar Fausel's claim of anticipatory breach. For the reasons stated, we conclude the district court erred in determining that Restatement (Second) of Contracts section 254 barred Fausel's claim of anticipatory breach.

If the district court considers section 254, the court should also consider section 255 of the Restatement (Second) of Contracts. Section 255 provides that, when a

party's repudiation contributes materially to the nonoccurrence of a condition to one of the repudiator's duties, the nonoccurrence is excused. Fausel contends, and there is evidence that, but for the June 12 letter, the Division of Gaming would have approved his application. Therefore, the record does support Fausel's contention that, pursuant to section 255, his obligation to secure the approval was excused. We are not, however, suggesting by this discussion that the district court is bound to make such a finding.

### IV. Disposition.

In sum, we conclude the district court erroneously construed the Stock Agreement as requiring Fausel to obtain approval from the Colorado Division of Gaming by July 31, 1995. When correctly construed, the Stock Agreement allowed Fausel a reasonable period of time within which to secure the approval. The court's erroneous construction of the Stock Agreement prevented the court from reaching the question of whether JRJ's June 12, 1995 letter constituted an anticipatory breach of that agreement. We must therefore reverse and remand on this issue to allow the district court to determine from the record already made whether a reasonable time for Fausel to obtain approval from the Division of Gaming extended beyond June 12, 1995. If the court makes such a finding, the court must then determine from the record already made the merits of Fausel's claim of anticipatory breach.

We further conclude that the district court's erroneous construction of the Stock Agreement as requiring Fausel to obtain Division of Gaming approval by July 31, 1995, led it to erroneously conclude Restatement (Second) of Contracts sections 181 and 254 barred Fausel's claim of anticipatory breach. We must therefore reverse and remand on these two issues to allow the district court to determine from the record already made and based on our construction of the Stock Agreement

whether these two provisions bar Fausel's claim of anticipatory breach.

We have considered all of the parties' contentions, even though we have not addressed all of them. Those we have not addressed either lack merit or are unnecessary for us to address because of the result we reach.

### REVERSED AND REMANDED WITH DIRECTIONS.