# IN THE COURT OF APPEALS OF IOWA

No. 16-0310
Filed July 6, 2017

**JOHN DEPPE and DEPPE JJ, LLC f/k/a DOERSCHER-DEPPE, LLC,**
        Plaintiffs-Appellants,

**vs.**

**DOUGLAS H. DEPPE and KIM DOERSCHER-DEPPE,**
        Defendants-Appellees.

_____

Appeal from the Iowa District Court for Clinton County, Mark D. Cleve, Judge.

John Deppe and his business, Deppe JJ, LLC, appeal following jury verdicts in favor of defendants Doug Deppe and Kim Doerscher-Deppe. **AFFIRMED.**

Kevin J. Visser and Abbe M. Stensland of Simmons Perrine Moyer Bergman PLC, Cedar Rapids, for appellants.

James D. Bruhn, PLC of Farwell & Bruhn, Clinton, for appellees.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**DOYLE, Judge.**

John Deppe and his business, Deppe JJ, LLC, formerly known as Doerscher-Deppe, LLC, appeal following jury verdicts in favor of defendants Doug Deppe and Kim Doerscher-Deppe finding, among other things, that there was no breach of the parties' settlement agreement by the defendants. Plaintiffs assert the district court erred in not giving their proposed jury instruction defining the term "crop year" as used in the settlement agreement, arguing the term is defined by statute, regulation, by the court, by industry usage, and by the parties. Plaintiffs argue the district court compounded the error by instructing the jury that "There is no established legal definition of 'crop year' in this case." Upon our review, we conclude, based upon the language of the parties' settlement agreement along with the extrinsic evidence presented, there was no reversible instructional error. Further, we conclude that, even if there was instructional error, it did not result in prejudice because of Plaintiffs' failure to materially comply with the terms of the settlement agreement. Accordingly, we affirm the jury's verdicts.

## I. *Background Facts and Proceedings.*

This appeal concerns the settlement agreement entered into by the former members of Doerscher-Deppe, LLC ("LLC")—John Deppe, his cousin Doug Deppe, and Doug's wife Kim Doerscher-Deppe. Doug, Kim, John, and John's wife, Joelle, have engaged in farming most of their lives. John, Doug, and Kim each have experience leasing farm land; Doug and Kim leased their own land to John, who owned his own equipment, to farm their land.

Kim's father, owner and operator of Doerscher Ag, Ltd., passed away in 2006. His business owned land that was leased, but, by way of a trust in favor of Kim's mother, the trust was the lessor of some of that land and the rents collected were assigned to Kim's mother. Additionally, Kim's father, through his business and also individually, continually leased and farmed other farms. Upon his death, Kim and her two siblings each inherited a third of their father's company's shares.

To maintain and farm the leases held by Kim's father's company, which still had time remaining upon them, John, Doug, and Kim formed LLC in 2007. John owned fifty percent, and Doug and Kim each owned twenty-five percent. LLC borrowed money for initial expenses, including paying rent due on the farmland leased and financing the crops. John custom farmed the land leased by LLC with his own equipment, and Kim sold the crops. The LLC would then pay John for his custom farming out of the proceeds of the sales. The money left in LLC after the expenses were paid was used to pay down the loan and to finance LLC's operations for the next year. Kim and Doug took care of LLC's books, including writing the checks to pay their landlords, and they maintained the relationships with their landlords, essentially acting as the face of LLC.

By 2012, John, Doug, and Kim had disagreements concerning LLC's operation. Kim's mother terminated her trust's lease with LLC, as did Kim's brother, on behalf of Doerscher Ag, Ltd. John eventually filed suit against Doug and Kim.

Ultimately, LLC's members entered into a settlement agreement in January 2013, setting forth numerous terms to which the parties assented.

Among many things, the agreement provided that Kim and Doug would transfer their membership interest in LLC to John in exchange for a cash settlement. Additionally, the parties agreed to the following paragraphs at issue here:

3. [LLC] will be entitled to farm [several farms that LLC had leased, including the Wegener farm, the Curtis farm, the Merle Doerscher farm, the Kelly farm, and the Carter/Conklin farm]. . . .
4. Kim and Doug will be entitled to farm the [farmland leased by Doerscher Ag, Ltd. and the trust]. . . .
5. At the end of the 2013 crop year, all leases are open for negotiation, to any party.
. . . .
14. Upon completion of the settlement, [LLC] shall notify its landlords that Kim and Doug are no longer members of [LLC]. The Notice shall inform the landlords that [LLC] will honor the 2013 leases and [John] will be sole owner and operator of [LLC] for 2013.

After entering into the agreement, LLC paid Doug and Kim their settlement funds, and Doug and Kim transferred their ownership interest in LLC to John. Though John farmed the land leased to LLC as agreed, when John's wife sent out rent checks to LLC's landlords in February 2013 on behalf of LLC, she included a handwritten note letting the landlords know she was LLC's new bookkeeper and for them to let John know if they needed anything. The letter also stated that John wanted "to meet with you the next time you're in Davenport to see if there is anything you need (any improvements) done on your farm ground for 2013." While there was no specific statement that Doug and Kim were no longer members of LLC and that John was now its sole owner, John testified the purpose of the letter was to satisfy paragraph fourteen of the settlement agreement.

In June 2013, while John was at the Wegener farm, he talked to landlord Lois Wegener's son, Dirk Wegener. Dirk did not know who John was because

he had never dealt with him concerning his mother's farm. Dirk testified John asked him what his mother was "going to do with the farm the following year." Dirk contacted his mother, who was out of state, and told her about his conversation with John and his confusion of the situation "because we had always dealt with Doug." Doug, Kim, Dirk, and Dirk's mother had dinner at the farm in July 2013, and they discussed Doug and Kim's leaving of the LLC. Doug and Kim then expressed their desire to rent Lois's farmland for 2014, after her lease with LLC ended.

Lois met with her attorney shortly thereafter to draft a new lease, and she brought with her a copy of the existing lease with LLC. The attorney asked her who the lessee would be, and Lois told him Doug and Kim. When the attorney pointed out the existing lease was with LLC, Lois told the attorney to contact Doug. Lois's attorney was able to reach Doug after Lois left his office, and Doug told him LLC had been dissolved. The attorney drafted the new lease as directed with Doug and Kim as tenants, which they signed, but because Lois had left town, she told her attorney she would sign the lease when she returned to town in a few weeks. The attorney sent to LLC, including John, a termination of tenancy notice for the Wegener farm.

After receiving the notice, John contacted his attorney, who then contacted Lois's attorney. Lois's attorney learned about the settlement agreement between John, Doug, and Kim regarding LLC, and John met with Lois's attorney and offered to rent her farm in 2014 for a higher amount. Lois's attorney relayed the offer to Lois, and Lois told him she was going to think about it and speak with her children. Lois talked to Doug and told him about John's

higher offer, and he offered to match John's. Lois talked to Dirk and asked for his input, and Dirk stated he was not happy with the way the farmland had been taken care of 2013. Lois ultimately leased the farmland to Doug and Kim.

After John received the termination notice from Lois in July 2013, he contacted another of his landlords, Eldon Curtis, about leasing the Curtis farm in 2014. Doug likewise contacted Eldon about him and Kim leasing the Curtis farm. LLC received a termination-of-tenancy notice concerning the Curtis farm lease, and ultimately the Curtis farm was leased to Doug and Kim on March 1, 2014.

In April 2014, John and LLC (hereinafter collectively "Plaintiffs") filed suit against Doug and Kim for breach of contract, among other things, which was later amended. Specifically, Plaintiffs claimed "crop year" as used in the settlement agreement had "a clear, unambiguous meaning. Crop Year has been defined by the Iowa Code Chapter 562 [(2013)] and long standing Iowa Case law as March 1 through March 1" and "[n]egotiation, discussions, or any conduct relating to the farm leases should not have started until March 1, 2014." Plaintiffs asserted Doug and Kim began negotiating leases before March 1, 2014, and, therefore, materially breached the settlement agreement. In Doug and Kim's answer to the petition, they affirmatively defended that Plaintiffs "themselves contacted landlords prior to March 1, 2014, in an effort to negotiate leases commencing March 1, 2014, and have acted in a manner contrary to their interpretation of paragraph 5 of the Agreement" and "are therefore barred by the doctrine of equitable estoppel and/or judicial estoppel from asserting a contrary position in this action."

Prior to trial, Plaintiffs filed a motion in limine seeking, among other things, that the court take judicial notice of the meaning of "crop year," because the court had previously ruled, in denying in part Plaintiffs' motion to compel production of other leases by Doug and Kim, the "argument the leases would develop the term 'crop year' is without merit. That term is a legal phrase with an established meaning under Iowa law."

Additionally, both sides submitted proposed jury instructions to the court before trial. Plaintiffs proposed that the jury be instructed that "[a] crop year is defined as beginning on the first day of March and ending on the last day of the following February." Doug and Kim's proposed instructions did not discuss the term "crop year" at all. In objecting to Doug and Kim's proposed instructions regarding interpretation of contracts, Plaintiffs argued the settlement agreement was unambiguous and the term "crop year" had an unambiguous, statutorily defined meaning.

A jury trial commenced January 19, 2016. Prior to hearing evidence, the court took up Plaintiffs' motion in limine, including whether the court would take judicial notice of the definition of "crop year." Plaintiffs asserted the meaning was defined by law, which a different judge had previously found in a prior ruling, and requested judicial notice be taken. Doug and Kim resisted, explaining:

> [Plaintiffs'] request is tantamount to adjudication of law points or even it goes so far as a . . . partial motion for summary judgment. This has been an issue that was addressed in—in the summary judgment ruling. It doesn't meet . . . the criteria of the rule we set out in our brief for taking judicial notice. It is not like taking judicial notice of what day of the week was January 6th of last year. Crop year can have all different meanings and can have all different meanings depending on what context it was used in, and it goes to the heart of the issue at hand. It isn't a term as used in the

agreement, and the agreement itself did not adopt any definitions and they—it is a distortion to say crop year is defined in Chapter 562, because it is not defined in Chapter 562. So there is no law defining crop year to take judicial notice of; no established law particularly as what it was intended in the context of the sentence that is at issue in this case.

The court declined Plaintiffs' request to take judicial notice of the statutory definition of "crop year."

Prior to submitting the matter to the jury, the court gave the parties its proposed jury instructions and heard the parties' exceptions and objections. Plaintiffs objected to the court's proposed instruction number fourteen, which stated "[t]here is no established legal definition of 'crop year' in this case. You are to determine the meaning of all of the words used by the parties in the Settlement Agreement." Plaintiffs argued the instruction was

> not a proper statement of the law. We believe that the phrase "crop year" does have a clear unambiguous and statutorily defined meaning; that crop year runs from March 1st to the last day of February, according to Iowa Code section 562. Also previously in this case, [a different judge] indicated in his ruling on June 8, 2015, in Plaintiffs' Motion to Compel—in that order he said "crop year" is a legal phrase with an established meaning under Iowa law. And so Your Honor, we would object to Instruction Number 14.

Doug and Kim argued the instruction was a "proper statement of law in this case," because "there is no definition of 'crop year' under Chapter 562" and the settlement agreement "did not set forth any definitions and it is—it is an inappropriate instruction to clearly instruct the jury on the law as it applies to this particular fact of this case." The court ruled "that the instructions as proposed and submitted by the court are supported by existing Iowa law and are drafted such that they apply to the various issues and fact matters that have been put into controversy by the parties."

After hearing all of the evidence and various motions were made, the matter was submitted to the jury. Ultimately, the jury returned verdicts in favor of Doug and Kim. The jury specifically answered "NO" to the question of whether Doug and Kim "breached the Agreement with Plaintiffs."

Plaintiffs now appeal, arguing the district court erred in not defining crop year in the jury instructions as they proposed. They argue the term is defined by statute, regulation, by the court, by industry usage, and by the parties, necessitating the court to give their proposed instruction defining crop year. They further argue the crop year instruction given by the court compounded the error.

## II. Standard of Review.

In Iowa, courts must submit "a requested jury instruction if it correctly states the applicable law and is not embodied in other instructions." *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016) (citation omitted); *see also Le v. Vaknin*, 722 N.W.2d 412, 414 (Iowa 2006) ("We review the district court's rulings on jury instructions to determine if they are a correct statement of the applicable law based on the evidence presented."). Consequently, a court's refusal to give a requested jury instruction is reviewed on appeal for correction of errors at law. *See Alcala*, 880 N.W.2d at 707-08. "Nonetheless, error in giving or refusing to give an instruction does not require reversal unless the error is prejudicial." *Stover v. Lakeland Square Owners Ass'n*, 434 N.W.2d 866, 868 (Iowa 1989). "Prejudicial error occurs when the district court 'materially misstates the law,'" and if the instructions, considered together in their entirety, misled the jury, reversal is warranted. *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5

(Iowa 2009) (citation omitted). "'When the error is not of constitutional magnitude, the test of prejudice is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice.'" *Asher v. OB-Gyn Specialists, P.C.*, 846 N.W.2d 492, 496 (Iowa 2014) (citation omitted), *overruled on other grounds by Alcala*, 880 N.W.2d at 707.

### III. Discussion.

Plaintiffs argue the trial court erred in failing to give their proposed instruction defining "crop year" and then compounded the error by giving instruction fourteen which stated, "[t]here is no established legal definition of 'crop year' in this case. You are to determine the meaning of all of the words used by the parties in the Settlement Agreement." Doug and Kim counter that the giving of instruction fourteen was appropriate under the circumstances, but in any event, was not prejudicial to the Plaintiffs.

We find no error in the district court's refusal to submit Plaintiffs' proposed instruction defining "crop year." There is no dispute that the term "crop year" was not defined in the settlement agreement nor was there any express reference to an external definition of the term. Plaintiffs essentially maintain that all professionals in the farming industry define "crop year" as beginning on March 1 and ending at the end of February the following year, meaning the use of term "crop year" was unambiguous and required defining the term for the jury as they proposed.

Settlement agreements are contractual in nature, and legal principles concerning contracts generally apply. *Waechter v. Aluminum Co. of Am.*, 454

N.W.2d 565, 568 (Iowa 1990). "In reviewing a contract, we may engage in interpretation or construction of the contractual terms." *Payton v. DiGiacomo*, 874 N.W.2d 673, 677 (Iowa Ct. App. 2015). "Interpretation is a process for determining the meaning of words in a contract," whereas construction "is a process of determining the legal effect of such words." *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999). The cardinal principle of both interpretation and construction of written contracts is that the intent of the parties at the time they entered into the contract must control. *See* Iowa R. Civ. P. 6.904(3)(n); *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008).

To determine the obligations of the parties, we look to the language contained within the four corners of the contract. *See Clinton Physical Therapy Servs., P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 615 (Iowa 2006); *Berryhill v. Hatt*, 428 N.W.2d 647, 654 (Iowa 1988). "We strive to give effect to all the language of a contract, which is the most important evidence of the contracting parties' intentions." *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 77 (Iowa 2011). "If the principal purpose of the parties is ascertainable from the words and other conduct of the parties in light of all the circumstances, we give those words and conduct great weight when interpreting the contract." *NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 466 (Iowa 2010). Yet, "[c]ontractual obligations may arise from implication as well as from the express writing of the parties" because "[a] contract includes not only what is expressly stated but also what is necessarily to be implied from the language used; and terms which may clearly be implied from a consideration of the entire contract are as much a part thereof as though plainly written on its face."

*Fashion Fabrics of Iowa, Inc. v. Retail Inv'rs Corp.*, 266 N.W.2d 22, 27 (Iowa 1978) (citation omitted). Additionally, "while words are to be given their ordinary meaning, particular words and phrases in a contract are not to be interpreted in isolation." *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991). But if a genuine uncertainty exists concerning which of two reasonable constructions is proper after application of pertinent rules of interpretation to the face of the instrument, an ambiguity exists. *See Berryhill*, 428 N.W.2d at 654. Generally speaking, "caution should be exercised in applying statutory definitions to situations in which the particular statutory scheme may not be involved." *Le*, 722 N.W.2d at 415. Nevertheless, even if there is no ambiguity, we can also consider extrinsic evidence, including the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties, when determining the meaning of a contract and the parties' intent. *See NevadaCare, Inc.,* 783 N.W.2d at 466; *Pillsbury Co.*, 752 N.W.2d at 436; *see also* C-*Thru Container Corp. v. Midland Mfg. Co.*, 533 N.W.2d 542, 545 (Iowa 1995) ("We also hold that even a 'complete' contract may be explained or supplemented by parol evidence of trade usages."). "When the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences that can be drawn from the extrinsic evidence, the question of interpretation is determined by the finder of fact", *Pillsbury Co.*, 752 N.W.2d at 436, except where "the evidence is so clear that no reasonable person would determine the issue in any way but one." *Fausel*, 603 N.W.2d at 618.

Here, the settlement agreement did not expressly define "crop year," and, although there was testimony that leases of farmland tend to commence March first, the evidence was not so clear that no reasonable person would determine "crop year" could only mean the period of time running from March first to the end of February of the following year. Plaintiffs state the term is "defined by the Iowa Code Chapter 562," but there is no express definition of the term in chapter 562. Plaintiffs refer to section 562.6, which states, in relevant part, that

> a farm tenancy shall continue beyond the agreed term for the following crop year and otherwise upon the same terms and conditions as the original lease unless written notice for termination is served upon either party or a successor of the party in the manner provided in section 562.7, whereupon the farm tenancy shall terminate March 1 following. However, the tenancy shall not continue because of an absence of notice if there is default in the performance of the existing rental agreement.

Clearly Plaintiffs' definition of "crop year" is a reasonable inference that can be drawn from the use of the term in section 562.6, but there is more to take into consideration. Iowa Code section 562.7 requires notice of termination to be given on or before September 1 in order to terminate a farm tenancy the March 1 following. So, for example, if notice of termination is not given by September 1, 2013, a one-year farm lease commencing March 1, 2013, will automatically be extended beginning the first day of March 2014 and ending the last day of February 2015. The settlement agreement was made in January 2013. If the landlords decided they wanted to change tenants after learning Doug and Kim were no longer members of LLC, they had to give LLC notice of the tenancy's termination by September 1, 2013, under section 562.7. Applying Plaintiffs' definition of "crop year" to the settlement agreement, lease negotiations could not

open until March 2014—well beyond the September 1, 2013 section 562.7 deadline, effectively denying anyone from making lease negotiations for the 2014 crop year. Under the facts presented, this makes no sense. Consequently, we find it was also reasonable to interpret the agreement's provision that, "[a]t the end of the 2013 crop year, all leases are open for negotiation, to any party," simply meant the leases were open for negotiation by any party concerning the 2014 crop year. Additionally, paragraph fourteen of the settlement agreement supports this conclusion as it specifically locks in LLC as the tenant for the 2013 leases only, but makes no similar provision for subsequent lease years. The court left the interpretation up to the jury, and Plaintiffs were able to present extrinsic evidence as to why their definition was the correct one. Given the circumstances, we conclude the district court committed no reversible instructional error.

But even had there been instructional error, it was not prejudicial to the Plaintiffs. Doug and Kim assert Plaintiffs materially breached the contract by failing to comply with the terms and provisions of paragraph fourteen of the settlement agreement regarding notice to landlords of the change in ownership, honoring leases and name change of LLC.[1] Put another way, they argue Plaintiffs failed to establish they performed all of the material terms of the settlement agreement, and having failed to prove a requisite element of their

---

[1] Paragraph fourteen of the settlement agreement provides: "Upon completion of the settlement, [LLC] shall notify its landlords that Kim and Doug are no longer members of [LLC]. The Notice shall inform the landlords that [LLC] will honor the 2013 leases and [John] will be sole owner and operator of [LLC] for 2013."

claim, their claim fails and the definition of "crop year" becomes immaterial. We agree.

Jury instruction number seven set out the elements Plaintiffs were required to prove in order to prove their breach of contract claim:

> 1. The consideration.
> 2. The terms of the contract.
> 3. [P]laintiffs have performed all of the material terms of the contract.
> 4. [Doug and Kim] have breached the contract.
> 5. The amount of any damages [Doug and Kim] have caused.

*See also Iowa Arboretum, Inc. v. Iowa 4-H Found.*, 886 N.W.2d 695, 706 (Iowa 2016) (setting out the elements of a breach-of-contract claim). Plaintiffs were required to prove all the elements, and if they failed to prove any one, their claim fails. The jury was not asked if Plaintiffs proved each element. The special verdict form just asked the jury if Doug and Kim "breach[ed] the Agreement with Plaintiffs," to which the jury answered, "NO."

In this case, it is clear that the letter sent out by John's wife on Plaintiffs' behalf did not comply with paragraph fourteen of the settlement agreement, as it did not inform the landlords of Doug and Kim's exit from LLC as expressly required by the settlement agreement, and no other formal notice was given to the landlords by Plaintiffs. This is critical, because the undisputed evidence shows that Lois Wegener was confused by Plaintiffs' letter, and *she* reached out to Doug and Kim for an explanation based upon her relationship with the two of them. Had Plaintiffs complied with paragraph fourteen of the settlement agreement, Wegener arguably would not have had a reason to contact Doug and Kim about the lease. Under the facts of this case, it does not appear Plaintiffs'

rights were injuriously affected or that they suffered a miscarriage of justice by the court's ruling declining to define "crop year" as proposed, because Plaintiffs did not comply with the agreement themselves, leading to the alleged breach by Doug and Kim. *See Passehl Estate v. Passehl*, 712 N.W.2d 408, 418 (Iowa 2006) ("If both parties fail to perform their mutual and simultaneous obligations under a contract, then neither is in default."). A reasonable jury could have found Plaintiffs failed to prove that they performed all of the material terms of the contract by breaching paragraph fourteen of settlement agreement. Simply put, the failure to give the instruction, even if error, did not result in prejudice because of Plaintiffs' own failure to comply with the terms of the settlement agreement. *See id.*

Accordingly, we affirm the jury's verdicts.

**AFFIRMED.**