# IN THE COURT OF APPEALS OF IOWA

No. 19-0147
Filed February 5, 2020

IN RE THE MARRIAGE OF RANDY LYNN KOHORST
AND MICHELLE ANN KOHORST

Upon the Petition of
**RANDY LYNN KOHORST,**
        Petitioner-Appellant,

**And Concerning**
**MICHELLE ANN KOHORST,**
        Respondent-Appellee.

_____

        Appeal from the Iowa District Court for Carroll County, William C. Ostlund,

Judge.


        Randy Kohorst appeals a dissolution decree giving Michelle Kohorst a life

estate in a lakefront property he purchased before the marriage and awarding her

traditional spousal support. **AFFIRMED AS MODIFIED.**


        John J. Wood and Kate B. Mitchell of Beecher, Field, Walker, Morris,

Hoffman & Johnson, P.C., Waterloo, for appellant.

        Ryan J. Baumgartner of Cashatt Warren Family Law, P.C., Des Moines, for

appellee.


        Heard by Bower, C.J., and May and Greer, JJ.

**GREER, Judge.**

Randy Kohorst appeals the district court's dissolution order, arguing the court erred by (1) granting Michelle Kohorst a life estate in a lakefront property he purchased before the marriage and (2) awarding her traditional, monthly spousal support. We conclude the plain language of the premarital agreement grants Michelle a life estate in the property. We modify the district court decree to require Michelle to pay the expenses related to the property. We affirm the spousal support award and award Michelle appellate attorney fees.

## I. Background Facts and Proceedings.

After twelve years of dating, Randy and Michelle married on August 6, 2005. This was a second marriage for both parties. Randy had acquired significant assets managing a farming operation and, at the time of the wedding, Randy's net worth was $4 million.

Shortly before they got married, and at Randy's request, Randy and Michelle entered in to a premarital agreement. Randy's lawyer prepared the agreement. Michelle's attorney reviewed the agreement and suggested revisions on August 3. Randy accepted the revisions, and the parties signed the agreement on August 4, two days before the wedding.

Section 5 of the agreement discussed a property Randy bought two years before the marriage located in Okoboji, Iowa (the "Okoboji Property"). Randy agreed to transfer twenty percent of his interest in the property to Michelle in exchange for $60,000.[1] The last paragraph stated,

---

[1] The full value of her twenty-percent interest equaled $130,000 at the time of transfer.

Randy further agrees that when he conveys the 20% interest to Michelle, he will also create a legal life estate in the entirety of the above described property in favor of Michelle. Michelle agrees that if she is operating the premises after Randy's death, she will allow Randy's children the right to stay on the premises and use all of the facilities associated therewith during all holidays, and during their vacations. The children shall give Michelle reasonable notice of the times they intend to use the premises.

In November, Randy and Michelle executed a quitclaim deed transferring twenty percent of Randy's interest in the property to Michelle. The deed did not mention the life estate. Randy did, however, later create a life estate in favor of Michelle in his will, which would have taken effect at the time of his death.

Michelle contributed significantly to this marriage. She worked outside the home, maintained the Okoboji and Arcadia homes, and was also a hands-on farm wife. She worked full time during the week and on Thursday night would go grocery shopping and cook meals for the farmworkers Randy employed. On Friday she would drive back to the family home in Arcadia to feed the workers and help with chores around the farm throughout the weekend. Michelle embraced Randy's family and even cared for his mother until she died.

They separated in November 2016, and Randy filed a dissolution of marriage petition in May 2017. By then, Randy's net worth had grown to approximately $15 million, while Michelle was earning $29 an hour. Michelle made no request for temporary spousal support while the case progressed.

After a trial, the district court entered a dissolution decree and enforced the premarital agreement by awarding Michelle a life estate in the Okoboji Property and requiring Randy to pay Michelle her twenty percent interest in that real estate. The district court awarded Michelle $10,000 per month in traditional spousal

support and required Randy to pay Michelle's attorney fees. The decree also required Michelle to pay property taxes, insurance, and day-to-day maintenance costs for the Okoboji Property. Michelle moved to amend or enlarge, asking the court to order Randy to pay homeowner's insurance. The court entered a posttrial order requiring Randy to pay property taxes and insurance. Randy appeals. Michelle asks for her appellate attorney fees.

## II. Standard of Review.

We review dissolution actions de novo. *In re Marriage of Shanks*, 758 N.W.2d 506, 510 (Iowa 2008). For that reason, "issues concerning the validity and construction of premarital agreements are equitable matters subject to [the court's] de novo review." *Id.* "We give weight to the factual determinations made by the district court; however, [its] findings are not binding upon us." *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015).

## III. Analysis.

Randy argues that the district court erred by granting Michelle a life estate in the Okoboji Property and awarding her traditional spousal support. We will address each claim in turn. We then address Michelle's request for appellate attorney fees.

**A. Michelle's Life Estate in the Okoboji Property.** At the outset we note that both parties agree the premarital agreement is enforceable. *See, e.g.*, Iowa Code § 596.8 (2017) (establishing grounds for finding a premarital agreement unenforceable). They disagree, however, whether its terms are ambiguous and whether the court should look outside the agreement to determine their meaning.

"We have said that prenuptial agreements are entitled to the same consideration and construction as other contracts." *In re Marriage of Spiegel*, 553 N.W.2d 309, 313 (Iowa 1996), *superseded by statute on other grounds as recognized in Shanks*, 758 N.W.2d at 512. "The cardinal rule of contract interpretation is to determine what the intent of the parties was at the time they entered into the contract." *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 435 (Iowa 2008).

That said, "the words of the agreement are still the most important evidence of the party's intentions at the time they entered into the contract." *Id.* at 436. "It is a fundamental and well-settled rule that when a contract is not ambiguous, we must simply interpret it as written." *Smidt v. Porter*, 695 N.W.2d 9, 21 (Iowa 2005). "[A] contract is not ambiguous merely because the parties disagree over its meaning. Instead, an ambiguity occurs in a contract when a genuine uncertainty exists concerning which of two reasonable interpretations is proper." *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999) (citation omitted).

> Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. But after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention.

*Passehl Estate v. Passehl*, 712 N.W.2d 408, 415 (Iowa 2006) (quoting Restatement (Second) of Contracts § 212 cmt. b) (citation omitted). "When the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences that can be drawn from the extrinsic

evidence, the question of interpretation is determined by the finder of fact."
*Pillsbury Co.*, 752 N.W.2d at 436.

Applying the relevant law to this agreement, we address the fighting issue: Did the parties intend Michelle to have a life estate in the Okoboji Property under any circumstance, including after a potential dissolution of the marriage, or did they intend for the life estate to take effect in the event of Randy's death only as married persons? We examine all of the terms of the agreement to answer what result the parties intended.

As noted, the contract language at issue provides,

> Randy further agrees that when he conveys the 20% interest to Michelle, he will also create a *legal life estate in the entirety of the above described property* in favor of Michelle. Michelle agrees that if she is operating the premises after Randy's death, she will allow Randy's children the right to stay on the premises and use all of the facilities associated therewith during all holidays, and during their vacations. The children shall give Michelle reasonable notice of the times they intend to use the premises.

(Emphasis added.)

According to Randy, at the time he entered into the premarital agreement he intended for Michelle to have a life estate in the Okoboji Property only if he died while they were still married. Randy's attorney who drafted the agreement echoed this understanding. This understanding dovetails with Randy's later-executed will and does not conflict with the terms of the quitclaim deed. Michelle voiced her preference of staying at the Okoboji Property but no one asked her to explain her understanding of the language of the agreement.

While Randy's testimony is a plausible interpretation of the agreement, it is also plausible that it was Randy's intent for Michelle to be able to stay the property

for life, even in the event of dissolution. The parties entered into this agreement at Randy's insistence, and the agreement was drafted by Randy's attorney, with input from Michelle's attorney. While Michelle's attorney drafted the language of the provision at issue, Randy's attorney approved the language and incorporated it into the agreement. Randy could have granted Michelle a life estate as a concession for her entering into a premarital agreement that restricted her access to his considerable wealth in the event of a divorce.

We have considered Randy's arguments, but we conclude the four corners of the agreement are more persuasive. The contract term "creat[ing] a legal life estate in the entirety of the above described property in favor of Michelle" is not ambiguous. Moreover, if the parties only intended for Michelle to have a life estate in the event of Randy's death while they were married, the language stating, "if she is operating the premises after Randy's death, she will allow Randy's children the right to stay on the premises and use all of the facilities associated therewith" would be redundant.

We will enforce the contract as written. *See Thornton v. Hubill, Inc.*, 571 N.W.2d 30, 33 (Iowa Ct. App. 1997). After considering all of the language of the premarital agreement, we find that the parties' agreement intended for Michelle to have a life estate in the Okoboji property. Michelle shall retain the life estate and will also maintain her twenty percent interest in the property. We decline to modify the agreement and the court's decree in this regard.

That said, the premarital agreement provided no direction on the expense associated with that life use. As for the expenses of operating that life estate, we again look to the contract and Iowa law. Iowa law has long recognized a life estate

in real estate as an interest in that property. *In re Estate of Laughead*, 696 N.W.2d 312, 316 (Iowa 2005); *see also Beeman v. Stilwell*, 189 N.W. 969, 971 (1922) (discussing life estates). Moreover, it is an interest distinct from and independent of the remainder. *See Holzhauser v. Iowa State Tax Comm'n*, 62 N.W.2d 229, 235 (1953). "A life tenant has full control and possession of his tenancy, without any interference from those holding a remainder or reversion." *Id.* "A life tenant is required to pay the ordinary taxes, the interest on special assessments, and, on mortgages on the real estate. It also has the duty to keep the place in repair from ordinary wear and tear." *Id.* at 233.

Here, under the clear terms of the agreement, Randy agreed to grant Michelle a life estate in the Okoboji property. Likewise under the clear terms of the agreement, that grant is not restricted by any conditions. In keeping with our decision to not modify the agreement to add language in the event of a divorce, we also decline to add language requiring Randy to absorb the expenses of Michelle's life estate. Under Iowa law, Michelle maintains full responsibility for any taxes, interest on special assessments, mortgages on the real estate, and expense for ordinary wear and tear during the term of her tenancy. She will also be responsible for maintaining insurance on the contents of the Okoboji Property. Randy shall be responsible for maintaining the homeowner's insurance policy. We modify the ruling of the district court accordingly.

**B. Spousal Support.** The district court determined Michelle was entitled to $10,000 per month in traditional spousal support because of her extraordinary contributions to the marriage and the disparity in income and earning capacity between the parties. Randy challenges this award.

"A trial court has considerable latitude when making an award of spousal support." *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 486 (Iowa 2012). "The purpose of a traditional or permanent alimony award is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued." *Gust*, 858 N.W.2d at 408 (quoting *In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997)). "Where there is a substantial disparity [in income] we do not employ a mathematical formula to determine the amount of spousal support." *Id.* at 412.

Iowa Code section 598.21A(1) sets forth ten factors a court must consider when awarded spousal support. Two important factors in awarding traditional spousal support are the duration of the marriage and the "ability of a spouse to become self-sufficient at 'a standard of living reasonably comparable to that enjoyed during the marriage.'" *Gust*, 858 N.W.2d at 408 (quoting Iowa Code § 598.21A(1)(f)). We will only disturb an award on appeal "if it fails to do equity between the parties." *Id.* at 406.

In awarding Michelle $10,000 monthly, the district court considered the length of the marriage; the parties' age, health, educational level, and earning capacity; the property distribution; and the standard of living to which the parties were accustomed. *See* Iowa Code § 598.21A(1). Randy's net worth had grown from $4 million to $15 million during the marriage. At the time of the dissolution trial, Randy's monthly income exceeded $60,000, while Michelle's was $2716. Randy, then sixty-one, had retired by the time of the dissolution trial, but he was still expected to receive this substantial monthly income. Yet Michelle, age sixty, recently returned to full-time work, making twenty-nine dollars an hour, to access

health insurance.  Michelle has several health issues.  At the time of trial, Michelle estimated her expenses were $13,691.18 monthly.[2]

The court found Michelle's "extraordinary" contributions to the marriage "clearly facilitated Mr. Kohorst in accumulating the additional $11 million of net worth."  The court indicated that the disparity in income and earning potential was an important factor, noting the award would not affect Randy's financial condition or standard of living but would allow Michelle to maintain a standard of living that "she has earned and previously enjoyed."

We observe that because a spousal support award must be based on the circumstances of each particular case, our prior cases are of little precedential value.  *Gust*, 858 N.W.2d at 408.  However, they do provide some context, especially with regard to traditional spousal support.  "[O]ur caselaw demonstrates that duration of the marriage is an important factor for an award of traditional spousal support."  *Id.* at 410.  "Traditional spousal support is often used in long-term marriages where life patterns have been largely set and 'the earning potential of both spouses can be predicted with some reliability.'"  *Id.* (quoting *In re Marriage of Francis*, 442 N.W.2d 59, 62–63 (Iowa 1989)).  While there is no set formula, "the shorter the marriage, the less likely a court is to award traditional spousal support."  *Id.*  The length of the marriage is a consideration in this case.

"Generally speaking, marriages lasting twenty or more years commonly cross the durational threshold and merit serious consideration for traditional

---

[2] In May 2017, Michelle filed an estimated affidavit of financial status that estimated her monthly expenses were $6921.  Randy asks us to use this May 2017 affidavit when reviewing the spousal support award.

spousal support." *Id.* at 411; *see, e.g.*, *id.* (affirming award of $2000 monthly in traditional spousal support after twenty-seven year marriage); *In re Marriage of Barns*, No. 17-1298, 2018 WL 6418726, at *4 (Iowa Ct. App. Dec. 5, 2018) (affirming award of $7000 monthly for nine years—until the husband retired—after twenty-one-year marriage when wife was still able to work but there was a significant income disparity between the parties); *In re Marriage of Martin*, No. 14-0568, 2015 WL 576065, at *6 (Iowa Ct. App. Feb. 11, 2015) (affirming $2000 monthly for ten years in a combination rehabilitative/traditional spousal support award after twenty-year marriage); *In re Marriage of Hays*, No. 11-1847, 2012 WL 2407540 (Iowa Ct. App. June 27, 2012) (affirming award of $5000 monthly for one-hundred-twenty months after thirty-one-year marriage where wife was fifty-two, had made sacrifices to further husband's career, and husband earned approximately six and a half times what the wife made); *In re Marriage of Field*, No. 09-0187, 2010 WL 199967, at *1 (Iowa Ct. App. Jan 22, 2010) (affirming $14,000 monthly in support until wife turns sixty-six after thirty-eight-year marriage where husband earned approximately $740,000 annually and wife removed herself from workforce to raise children and support the husband's career); *In re Marriage of Stepaniak*, No. 08-1552, 2009 WL 1499559, at *1 (Iowa Ct. App. May 29, 2009) (affirming reduced award of $8500 monthly until the wife's fifty-eighth birthday, $5000 monthly thereafter until the husband retired, then the difference between $5000 and the wife's income from the husband's pensions after twenty-five-year marriage); *In re Marriage of Holliday*, No. 02-0286, 2003 WL 183777, at *2–3 (Iowa Ct. App. Jan. 28, 2003) (affirming reduced award of $1250 monthly for 120 months after twenty-five-year marriage because the wife had the potential to

earn more money and had an inheritance she could use to reduce some of her expenses); *In re Marriage of O'Rourke*, 547 N.W.2d 864, 867 (Iowa Ct. App. 1996) (affirming $2000 monthly award after twenty-seven-year marriage where husband's monthly net income exceeded $10,000 per month); *In re Marriage of Hayne*, 334 N.W.2d 347, 351 (Iowa Ct. App. 1983) (affirming $4000 monthly in traditional spousal support award after thirty-one year marriage).

However, we have affirmed traditional spousal support awards in cases involving marriages comparable in length to Randy and Michelle's thirteen-year marriage, although the amount of the award varies greatly depending on the characteristics of the parties and specific factors in the case. *See, e.g.*, *Schenkelberg*, 824 N.W.2d at 486 (affirming modified award of $7000 monthly in traditional spousal support to last for life or remarriage for a fifty-seven-year-old woman after sixteen-year marriage where husband earned substantial income and wife was unlikely to be able to generate enough income to enjoy the same standard of living she had enjoyed during the marriage); *In re Marriage of Lynch*, No. 17-2067, 2019 WL 319844, at *5–6 (Iowa Ct. App. Jan. 23, 2019) (affirming reduced award of $1000 monthly in traditional spousal support for thirteen-year marriage); *In re Marriage of Witherly*, 867 N.W.2d 856, 860 (Iowa Ct. App. 2015) (affirming reduced support award of $2600 monthly for five years, then $1300 per month until the wife turned sixty-five, remarried, or either party died, after sixteen-year marriage); *In re Marriage of Stone*, No. 10-1061, 2011 WL 662645, at *1–2 (Iowa Ct. App. Feb. 23, 2011) (affirming award of $1750 monthly for fifteen years then $1250 per month until the wife, then thirty-nine, turned sixty-five, then $750 per month thereafter after an eleven-year marriage, in part because the wife's

disabilities made it unlikely that she would become self-supporting at a standard she enjoyed during the marriage); *In re Marriage of McFadden*, No. 06-1212, 2007 WL 2376612, at \*2–3 (Iowa Ct. App. Aug. 22, 2007) (affirming reduced support award of $1000 per month until the wife reached age sixty-two, then to $600 per month thereafter after an eleven-year marriage); *In re Marriage of Van Horn*, No. 01-0789, 2002 WL 1428491, at \*4 (Iowa Ct. App. Jul. 3, 2002) (awarding $5500 monthly in traditional spousal support to a fifty-seven-year-old woman after a thirteen-and-one-half year marriage where husband left "with nearly all of his substantial assets intact," and the wife had limited assets and was unlikely to be able to attain the standard of living she had enjoyed during the marriage). *But see In re Marriage of Gutcher*, No. 17-0593, 2018 WL 5292082, at \*3 (Iowa Ct. App. Nov. 7, 2018 (declining to award traditional spousal support in a thirteen-year marriage). In some cases, we have affirmed spousal support awards in marriages shorter than thirteen years. *See, e.g.*, *Spiegel*, 553 N.W.2d 309 (Iowa 1996) (affirming a reduced spousal support award of $3000 monthly for ten years after a six-year marriage), *superseded by statute on other grounds as recognized by Shanks*, 758 N.W.2d at 512.

Randy has shown no compelling reasons to reverse the ruling of the district court. The district court's spousal support ruling is reasonable based on the characteristics of the parties and the facts here. We decline to disturb the spousal support award.

**C. Appellate Attorney Fees.** Michelle asks the court to award her appellate attorney fees. "An award of attorney fees is not a matter of right, but rests within the court's discretion and the parties' financial positions." *In re*

*Marriage of Liebich*, 547 N.W.2d 844, 851 (Iowa Ct. App. 1996). The court has the discretion to order an award of appellate attorney fees, and we should "consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the district court's decision on appeal." *In re Marriage of Ales*, 592 N.W.2d 698, 704 (Iowa 1999).

Randy appealed the district court order, obligating Michelle to defend the district court ruling. Michelle is now facing the task of handling the expenses of the Okoboji Property and adjusting to a new lifestyle. Randy shall be responsible for Michelle's appellate attorney fees.

**IV. Disposition.**

For all of the above-stated reasons, we conclude Michelle is entitled to a life estate in the Okoboji property and retains her twenty percent interest in the property. As the life tenant, she is required to pay all expenses and maintenance associated with her use as well as insurance for the contents of the property, though Randy shall be responsible for maintaining the homeowner's insurance policy. We affirm the spousal support order and award Michelle appellate attorney fees.

**AFFIRMED AS MODIFIED.**