# IN THE SUPREME COURT OF IOWA

No. 27 / 04-0874

Filed April 14, 2006

**DORIS N. PASSEHL ESTATE,**
**David Passehl and Karen**
**Zander, Co-Executors,**

      Appellee,

vs.

**JERRY W. PASSEHL and**
**VOLNETTA PASSEHL,**

      Appellants.

_____

On review from the Iowa Court of Appeals.


Appeal from the Iowa District Court for Franklin County, John S. Mackey, Judge.


Appellants seek further review from the court of appeals' decision affirming the trial court's decision interpreting and enforcing a settlement agreement. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED WITH INSTRUCTIONS.**


G. A. Cady III of Cady & Cady, Hampton, for appellants.


John J. Haney of Hinshaw, Danielson, Kloberdanz & Haney, P.C., Marshalltown, for appellee.

**STREIT, Justice.**

As the cynic Ambrose Bierce once said, "Death is not the end. There remains the litigation over the estate."[1]   Jerry and Volnetta Passehl claim the district court erred by enforcing a penalty provision in their settlement agreement with the Doris N. Passehl Estate (hereinafter "the Estate").   They now seek further review of the court of appeals' decision affirming the district court's ruling.  Because we find the terms of the penalty provision were not met, we vacate the decision of the court of appeals and reverse and remand to the district court with instructions.

### I. Facts and Prior Proceedings

Jerry, Karen, and David are the children of Doris N. Passehl.  Doris died in 1997.  At the time of her death, Doris owned approximately 160 acres of farmland in Franklin County.   Jerry Passehl and his wife, Volnetta (hereinafter "Passehls"), have, for the past fifteen years, occupied a five-acre portion of this land and operated an auto salvage business thereon.  The portion of land occupied by Passehls was covered with vehicles and, for the most part, surrounded by a fence.  The fence was erected in 1990 after the Franklin County Zoning Board of Adjustment approved the use of the land as a dismantling and recycling center on the condition that a six-foot-high enclosure fence surround the premises.  Two grain bins were also located within the fenced area.  The other 155 tillable acres were, and still are, leased to a third party.  The lease provides that the third party can use the two grain bins located on the land occupied by Passehls.

Karen and David serve as co-executors of the Estate.  After Doris's death, family disputes over Passehls' operation of the salvage business

---

[1]Ambrose Bierce, *The Collected Works of Ambrose Bierce* 865 (Neale Publ'g Co. 1911).

resulted in two separate lawsuits. In one lawsuit, the Estate filed suit against Passehls for breach of contract, conversion, and nonpayment of rent. In another lawsuit, the Estate filed an ejectment action to remove Passehls from the land. In an effort to resolve their differences, the parties agreed to settle these lawsuits through a written settlement agreement. The settlement agreement, signed October 17, 2002, provides:

> 2. [Passehls] agree to return to Karen Zander and David Passehl the motorized Shriner's car and the cornsheller.
>
> . . . .
>
> 4. [The Estate] agrees to sell to [Passehls] and [Passehls] agree to buy from [the Estate] . . . [a]n approximate five acre tract . . . [t]he legal description [of such land] shall be established by survey which shall coincide with existing fence boundaries required by Franklin County Zoning Ordinances.
>
> [Passehls] agree to deposit into the Brian D. Miller Trust Account[2] Twenty Thousand Dollars ($20,000.00) on or before October 18, 2002. The purchase price for the above described real estate shall be Fifty Thousand Dollars ($50,000.00). Closing shall be held on or before March 1, 2003. The parties agree that the $20,000.00 deposited into the Brian D. Miller Trust Account shall be applied toward the purchase price at time of closing.
>
> In the event that [the Estate] provides marketable title to the *subject* real estate, *but closing does not occur* on or before March 1, 2003, *as a result of nonperformance* by [Passehls], then the parties agree that the $20,000.00 deposited into the Brian D. Miller Trust Account shall be forfeited to [the Estate].
>
> . . . .
>
> The parties agree that Karen Zander and David Passehl shall have an easement for access to the grain bins located on the Passehl property but owned by Karen Zander and David Passehl for the purpose of loading and unloading grain. The parties acknowledge that Karen Zander and David

---

[2]Brian D. Miller is the attorney for the Estate. The trust account is his client trust account.

Passehl shall be entitled to any and all income from said bins. The [Estate] shall have the right to make repairs to the bins as necessary.

(Emphasis added.) The district court approved the settlement agreement. Both lawsuits, along with an unrelated pending appeal by Passehls, were dismissed with prejudice. On the same day, the parties signed an Iowa State Bar Association real estate contract form for the land described in the settlement agreement. At the time the agreement and contract were drafted, neither party had a precise legal description of this land. In both the settlement agreement and the real estate contract, the land was described as the following:

> The acreage locally known as 513 160th St., Latimer, Iowa and described as: An approximate five acre tract located in the Northwest Quarter (NW1/4) of section 26, Township 92 North, Range 22 West of the 5th P.M., Franklin County, Iowa. The legal description shall be determined by survey, which shall coincede [sic] with existing fence boundaries required by Franklin County Zoning.

The real estate contract also stated the purchase price for the real estate:

> 1. PRICE. The total purchase price for the Real Estate is . . . ($50,000.00) of which . . . ($20,000) has been paid. Buyers shall pay the balance to Sellers at Hampton, Iowa or as directed by Sellers, as follows: Said down payment of $20,000.00 shall be deposited in the Brian D. Miller Trust account before October, 18, 2002. Closing shall be on or before March 1, 2003. In the event the [Estate] provide[s] marketable title to the subject real estate, but as a result of nonperformance by [Passehls], the sale does not close then the parties agree that the $20,000.00 deposited in the Brian D. Miller Trust Account shall be forfeited to the [Estate].

The real estate contract set March 1, 2003, as the closing date.[3]

A subsequent survey determined the fence did not "line-up" with the boundaries set forth by the zoning ordinance. The land zoned for the salvage business was approximately 22,457 square feet less than the

___

[3]Both parties later agreed to postpone the scheduled March 1 closing due to a family emergency with one of the attorneys.

land demarcated by the fence. The boundary line described in the zoning ordinance cut through an existing garage, horse barn, and driveway, while the fence boundary did not.[4] After the survey, a disagreement developed between Passehls and the Estate as to whether the fence or the zoning ordinance boundary controlled the property to be conveyed.

On March 19, 2003, the Estate's attorney sent Passehls a letter with the following requirements for the real estate closing:

> 1. The motorized Shriner's car and corn sheller needs to be delivered by Jerry and Volnetta to Karen's residence, prior to the real estate closing.
>
> 2. Karen reports that the east bin cannot be accessed because of junk and junk vehicles stored around it. The junk and junk vehicles need to be cleared from the bins.
>
> 3. The horse pasture fence needs to be removed. Karen and David would like to know if Jerry and Volnetta plan to remove the fence and if so, the date by which they can expect the fence to be removed.
>
> 4. The junk vehicles located outside the fence and on the tillable farm ground need to be removed. Karen and David would like to know if Jerry and Volnetta plan to move these junk vehicles and if so, the date by which they can expect them to be moved.
>
> 5. As we have already mentioned by letter, the junkyard fence is not properly located per the Franklin County Zoning Variance. Karen and David want to know if Jerry and Volnetta plan to move the fence to the legal description consistent with the County Zoning Variances and if so, when that work will be completed by.

On March 24, 2003, the parties met to close the sale. Passehls brought a check for $30,000, but the Shriner's car and cornsheller had

---

[4]The land zoned for heavy industry, rather than for agricultural use, is described as the following:

> a tract of land beginning at the Northwest corner of Section 26, Township 92 North, Range 22 West of the 5th P.M., thence 370.0 feet to the point of beginning; thence S 500 feet; thence East 500 feet; thence West 500 feet to the point of beginning.

not yet been delivered to Karen and David.[5] The attorney for the Estate brought a deed, but the deed only conveyed the lesser amount of land defined by the zoning ordinance. An argument erupted between the parties. Karen, as co-executor of the Estate, stated Passehls had not performed because the Shriner's car and cornsheller had not been delivered, there were still vehicles surrounding one of the grain bins, and there were still vehicles outside of the fenced area. Jerry also objected because the property described in the deed did not match the property the parties had agreed upon. The discussions deteriorated, and the parties did not close the transaction.

On March 26, the Estate sent a letter to Passehls assigning April 1 as the new closing date. The letter declared "this will be the last time this real estate closing will be rescheduled . . . Karen and David are not willing to extend this matter further." The letter also reiterated the "five specific items that Jerry and Volnetta needed to take care of prior to the closing." The letter also stated the following:

> if the real estate closing cannot take place on April 1st, at the scheduled time, as a result of their non-compliance with the settlement agreement, my letter dated March 19, 2003, and this letter, the $20,000.00 currently being held in my Trust Account [will be] forfeited by Jerry and Volnetta.

On April 1, Passehls' attorney came to the closing with a check for $30,000. The Shriner's car and cornsheller had already been delivered to Karen and David; however, vehicles still surrounded one of the grain bins, and some junk vehicles still remained outside of the fenced-in area. The Estate came to the closing with a deed that did not conform to the existing fence boundaries. As before, Karen contended the terms of the

---

[5]The Shriner's car and cornsheller were delivered later that day or the next day.

contract were not fulfilled, and Jerry disputed the correct legal description of the property. Once again, the closing did not occur.

Days later, the Estate's attorney took the $20,000 out of his client trust account and paid it to Karen and David.

Passehls filed a motion to enforce the terms of the settlement agreement. The Estate filed a cross motion to enforce the settlement agreement. The Estate's requested relief included all of the following:

A. That the $20,000.00 placed in the Brian D. Miller Trust Account on or before October 18, 2002, is forfeited based upon [Passehls] failing to close the real estate transaction on or before March 1, 2003;

B. That the Court declare the survey conducted on December 6, 2002, establishing the fence boundary required by Franklin County Zoning Ordinance to be the legal description of the property subject to the Settlement Agreement and transaction with [Passehls];

C. That [Passehls] be forced to comply with the Settlement Agreement, consistent with the previous two Declaratory Judgment requests, by paying $50,000.00 to [the Estate] for the purchase of the real estate;

D. That pursuant to Rule 1.1501 of the Iowa Rules of Civil Procedure, an injunction issue prohibiting [Passehls] from placing anything within 20 yards of the bins, thereby preventing [Passehls] from interfering with [the Estate's] access easement.

E. That [Passehls] be enjoined from placing property of any kind outside of the boundary required by Franklin County Zoning Ordinances;

F. That [Passehls] be required to indemnify and hold harmless the [Estate] from any civil or criminal proceeding relating to [Passehls] operation of a junkyard.

After a bench trial, the trial court concluded the parties' intent was clear at the time the settlement agreement and real estate contract were signed—the fence was to remain, and the survey and conveyance would coincide with the fence. The court then concluded the $20,000 down

payment was forfeited because Passehls "failed to perform by not only providing access to the grain bins but also by failing to remove junk cars from outside the fence boundary, an agreed upon contingency required prior to closing." The court then ordered the Estate to execute a deed and convey the property within the fenced boundary once Passehls: paid an additional $50,000 to the Estate, moved all junk vehicles away from the grain bins, removed an unrelated horse fence, and removed the junk vehicles that were still outside the fenced-in area. The court also enjoined Passehls from placing anything within twenty yards of the grain bins and from placing anything else outside the existing fence boundary. Passehls appealed.

The court of appeals affirmed the decision of the trial court, and we granted Passehls' application for further review.

## II. Scope of Review

The parties dispute the scope of review. The Estate claims our review is for correction of errors at law because the case was filed at law. *See* Iowa R. App. P. 6.4. Passehls contend our review is de novo because the original motion to enforce judgment and the Estate's corresponding motion were both tried in equity. *See id.*

The original basis of this action, the settlement agreement, pertained to two cases, both of which were filed at law, and both of which were filed by the Estate. The settlement agreement ultimately led to the dismissal of the two underlying cases. Rather than file the present agreement under a new case number, Passehls filed the present motion under the case numbers of the dismissed cases. The fact that these two underlying actions were brought by the Estate as actions at law does not control our review of the present case. Passehls' motion to enforce the settlement agreement is separate from the causes of action in the cases

underlying the settlement agreement.  We therefore focus our attention on the nature of Passehls' motion and the Estate's subsequent motion.

Passehls' motion did not seek monetary damages; instead, Passehls asked the court to order the Estate to execute a court officer's deed.  Similarly, the Estate's motion did not seek monetary damages; the Estate asked the court to force Passehls to comply with the settlement agreement, to declare the land conveyed in the settlement agreement to be that which coincided with the zoning ordinance, and to declare that Passehls' $20,000 down payment was forfeited due to nonperformance. The Estate's motion also asked the court to enjoin Passehls from placing anything within twenty yards of the grain bins, to enjoin Passehls from placing any property of any kind outside of the zoning boundary, and to indemnify and hold harmless the Estate from any civil or criminal proceeding relating to the operation of the junkyard.

Both parties have asked the court to force the other party to fulfill its obligations according to the precise terms in the settlement agreement.  This is a form of specific performance.  Specific performance is a form of equitable relief.  *See Levis v. Hammond*, 251 Iowa 567, 576, 100 N.W.2d 638, 644 (1960).  Similarly, the Estate's request for an injunction is a request for equitable relief.  *Myers v. Caple*, 258 N.W.2d 301, 304-05 (Iowa 1977).

It is less clear whether the Estate's numerous requests for declaratory judgment were actions at law or in equity.  Our review of actions for declaratory judgment depends upon how the action was tried to the district court.  *Owens v. Brownlie*, 610 N.W.2d 860, 865 (Iowa 2000).  To determine the proper standard of review, we consider the "pleadings, relief sought, and nature of the case [to] determine whether a declaratory judgment action is legal or equitable."  *Nelson v. Agro Globe*

*Eng'g, Inc.*, 578 N.W.2d 659, 661 (Iowa 1998). We also consider "whether the court ruled on evidentiary objections" as an important, although not dispositive, test of whether the case was tried in law or equity. *See Sille v. Shaffer*, 297 N.W.2d 379, 380-81 (Iowa 1980)

Both parties' motions impliedly ask the court to use its equitable powers. Although the district court ruled on some evidentiary objections in the course of trial, the objections were minor and did not have a significant effect on the proceedings.[6] The district court ultimately used its equitable powers to order specific performance and to issue an injunction. The nature of the pleadings and the court's decision leads to the conclusion that this case was fully tried in equity.

Because this matter was tried by the district court wholly in equity, we review this appeal de novo. Iowa R. App. P. 6.4; *Owens*, 610 N.W.2d at 865.

### III. Merits

Bad blood, demands outside the four corners of the settlement agreement and corresponding real estate contract, and real estate contract forfeiture law have unnecessarily clouded the facts of this case. The parties disagree on the size of the property; both parties claim the other failed to perform their obligations under the contract, and neither party can agree on the meaning of the penalty provision.[7] Because this case can be resolved under basic contract principles, we will not

---

[6]During trial, the judge ruled on objections. Normally, this is the "hallmark of a law trial," but the fact that the trial judge did so does not automatically make this an at-law proceeding. *See Sille*, 297 N.W.2d at 381. Where, as here, no one claims the trial court improperly excluded evidence, the trial court's ruling on objections does not prevent a de novo review. *Id.*

[7]Neither party argues there was a mutual mistake at the time of the formation of the contract.

obfuscate the matter with irrelevant Iowa Code provisions concerning real estate contract forfeitures.[8]

## A. Size of the Property

Both parties dispute the meaning of the terms describing the property to be conveyed.

The Restatement (Second) of Contracts provides rules to aid our interpretation of contract terms. *See Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999) (applying sections 202 and 212 to the interpretation of contract terms). Section 202 provides:

> (1) Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight.
>
> (2) A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.

Restatement (Second) of Contracts § 202 (1981). These rules "do not depend upon any determination that there is an ambiguity, but are used in determining what meanings are reasonably possible as well as in choosing among possible meanings." *Id.* § 202 cmt. *a.* In addition, section 212 provides:

> Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. But after the transaction has been shown in all its length and breadth, *the words of an integrated agreement remain the most important evidence of intention.*

---

[8]The Iowa State Bar Association real estate contract form contains a boilerplate forfeiture provision; however, this provision is inapplicable because the arguments in this case do not center upon this provision and do not call for a forfeiture of the subject property.

Restatement (Second) of Contracts § 212 cmt. *b* (emphasis added) (citations omitted); *see also id.* § 209(1) ("An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement."). With these rules in mind, we turn to the language of the agreement and the circumstances surrounding the signing of the agreement.

The settlement agreement and the real estate contract both recite the following description of the property to be conveyed:

> The acreage locally known as 513 160th St., Latimer, Iowa and described as: An approximate five acre tract located in the Northwest Quarter (NW1/4) of section 26, Township 92 North, Range 22 West of the 5th P.M., Franklin County, Iowa. *The legal description shall be determined by survey, which shall coincede* [sic] *with existing fence boundaries required by Franklin County Zoning.*

(Emphasis added.) At trial, Passehls argued the parties wrote the contract so that Passehls could keep the junkyard as defined by the boundary fence. The Estate argued the fence was immaterial because the land to be conveyed was the land described by the zoning ordinance.

The record belies the Estate's argument. To conclude the intent of the parties was to convey only the property set forth in the zoning ordinance would require us to excise any reference to the fence in the property description as follows:

> The legal description shall be established by survey which shall coincide with ~~existing fence~~ boundaries required by Franklin County Zoning Ordinances.

(Strikethrough added.) We value each word in a written contract, and we are not persuaded to eliminate the phrase "existing fence" when a more suitable explanation is apparent. *See id.* § 212 cmt. *b* ("the words of an integrated agreement remain the most important evidence of intention").

A more sensible interpretation of the contract is that the phrase "required by Franklin County Zoning Ordinances" described the "fence" that was to be the subject of the survey. There were at least two fences in the area—a "horse pasture fence" and the boundary fence surrounding the junkyard. The boundary fence was erected in 1990 after the Franklin County Zoning Board of Adjustment approved the use of the site as a dismantling and recycling center on the condition that a six-foot-high enclosure fence surround the premises. The reference in the contract to the zoning ordinance was meant to describe the fence that controlled the size of the property; the zoning ordinance itself was not meant to control the size of the property.

The circumstances surrounding the signing of the contract also do not support the Estate's proposed description. Such a description would result in a property line that divided an existing garage, horse barn, and driveway. Such a description would also require that the existing fence be moved. Karen and David, the co-executors of the Estate, both testified they did not contemplate the boundary fence or any building or driveway would have to be moved for the conveyance. Their testimony indicates their primary concerns were to keep the junkyard from growing onto the land rented to a third party and to shield themselves from any liability relating to possible environmental contamination.

We therefore agree with the finding of the trial court; the intent of the parties was clear at the time the agreements were signed—Passehls contracted to purchase the land contained within the fenced boundary.

Presenting a deed conveying property that is 22,457 square feet less than the property bargained for does not constitute substantial performance of the terms of the settlement agreement or the real estate

contract. Therefore, the Estate effectively refused to perform its obligations under the contract.

## B. Penalty Provision

The settlement agreement and contract contain a penalty provision which provides the following:

> In the event that [the Estate] provides marketable title to the subject real estate, but closing does not occur on or before March 1, 2003, as a result of nonperformance by [Passehls], then the parties agree that the $20,000.00 deposited into the Brian D. Miller [the Estate's attorney's] Trust Account shall be forfeited to [the Estate].

A plain reading of this provision indicates the Estate must provide a marketable title to the subject real estate *before* the penalty provision can be enforced. Because the penalty provision sets forth a specific order of performance, the Estate's obligation to provide title to the appropriate real estate is a precondition to the enforcement of the penalty provision. As mentioned above, the Estate never proffered a deed to the real estate described in the settlement agreement or the real estate contract. Therefore, the penalty provisions contained within the written settlement agreement and real estate contract were not triggered.

## C. Breach

Despite the clear language of the penalty provision, the trial court still concluded the Estate was entitled to the $20,000 penalty because Passehls failed to perform "an agreed upon contingency prior to closing." The trial court found Passehls failed to perform this contingency by not providing access to the grain bins and not moving all junk vehicles into the fenced-in area. However, neither the settlement agreement nor the real estate contract expressly states this contingency. In order to find that this additional contingency existed, the trial court apparently

accepted the Estate's argument that there was a subsequent oral modification to the contract.[9]

The Estate contends a new oral agreement was formed on March 24 after Passehls "failed" to close. At that time Karen, the co-executor of the Estate, stated she would not enforce the $20,000 penalty so long as Passehls agreed to complete five specific items by April 1. These items included returning the Shriner's car and cornsheller, removing the junk vehicles from around the grain bins, removing the horse pasture fence, removing the junk vehicles from outside of the fenced areas, and moving the fence to comply with the zoning requirements. Although Passehls contends there was no such agreement, the Estate claims the agreement was memorialized through a letter prepared by the Estate's attorney and sent to Passehls on March 26.

A written contract may be modified by a subsequent oral contract that has the essential elements of a binding contract. *Berg v. Kucharo Constr. Co.*, 237 Iowa 478, 489, 21 N.W.2d 561, 567 (1946). Consent to the modification may be either express or implied from acts and conduct. *Davenport Osteopathic Hosp. Ass'n v. Hosp. Serv., Inc.*, 261 Iowa 247, 253, 154 N.W.2d 153, 157 (1967). However, proof of a claimed oral contract must come from more than "loose and random conversations." *Ehlinger v. Ehlinger*, 253 Iowa 187, 192, 111 N.W.2d 656, 659 (1961) (citations omitted).

---

[9]One might argue the clause in the settlement agreement that stated Passehls would grant an easement for access to the grain bins "for the purposes of loading and unloading grain" required the vehicles be moved prior to closing, but the Estate provides no evidence or case law supporting such an argument. Instead, the Estate made numerous contentions that the language in the settlement agreement was "clear and concise" and there was no ambiguity in the contract and therefore "the allowance of extrinsic evidence to explain the contract [was] irrelevant, immaterial and improper."

Our de novo review of the record leads us to the conclusion that Passehls did not agree to any oral modification. First, the letter that purportedly contains the terms of the contract does not reference any new oral agreement; instead, it threatens forfeiture if Passehls did not perform five tasks by April 1. Second, we find it unlikely Passehls abruptly abandoned the argument that the land conveyed was the land within the fence and then agreed to remove and erect a new fence to comply with the Estate's deed. Third, in order to accept that the parties agreed to this new contract, we must find the parties agreed to change not only what was due at closing, but also agreed to alter the specific order of performance set forth in the forfeiture provision. Given the fact that Jerry, Karen, and David had been feuding about their mother's estate for more than five years and the fact that this feud had sparked at least three separate lawsuits, we find it incredible that all would agree to a major modification of an existing settlement agreement and real estate contract without reducing the agreement to writing.

We therefore find there was no oral agreement modifying the existing contract.

### D. Current Status of Contract

In a real estate transaction, the law contemplates that each party will only relinquish their tight grip on their money or deed once they have their other hand firmly planted on the other party's money or deed; therefore, the law generally requires simultaneous performance. *Braig v. Frye*, 199 Iowa 184, 189, 199 N.W. 977, 979 (1924); *see also* 13 Richard A. Lord, *Williston on Contracts* § 38:8, at 407 (4th ed. 2000) [hereinafter *Williston on Contracts*] (stating the obligation of each party in a real estate contract "is subject to the condition precedent that the other party either perform, or make an absolute or conditional tender of performance"). The

penalty provision is the only language in either the settlement agreement or real estate contract which could possibly change the presumption of simultaneous performance. As discussed above, the penalty provision required the Estate to first tender a marketable title to the subject property before the penalty provision became applicable. At best, this means *the Estate* had to perform first by tendering marketable title to the subject property.

Even if we assume, arguendo, Passehls failed to tender proper performance on March 24 and April 1, we would still conclude *neither* party tendered proper performance on either date. If both parties fail to perform their mutual and simultaneous obligations under a contract, then neither is in default. *Braig,* 199 Iowa at 189, 199 N.W. at 979; *Wright v. Swigart,* 172 Iowa 743, 746, 154 N.W. 938, 939 (1915); *Waters v. Pearson,* 163 Iowa 391, 403, 144 N.W. 1026, 1031 (1914); *see also* 13 *Williston on Contracts* § 38:8, at 407 ("[b]efore either party can sue on a [real estate] contract, that party must first put the other party in default by tendering or offering to tender performance"). Without a default or breach by either party, the penalty provision becomes inapplicable and the contract continues as binding on both parties. *See Braig*, 199 Iowa at 189, 199 N.W. at 979.

### IV. Disposition

Because the Estate never proffered a deed to the appropriate property, the trial court erred when it decided the Estate was entitled to the $20,000 "forfeiture." We therefore reverse the decision of the district court.

At present, all of the obligations explicitly set forth in the settlement agreement and real estate contract have been performed by Passehls. The pending appeal was dropped; the Estate received the

$20,000 down payment; the remaining $30,000 rests in Passehls' attorney's trust account; the Shriner's car and cornsheller have been delivered; and Passehls acknowledged the easement for access to the grain bins.

Upon remand, the district court shall direct the Estate to tender performance by executing a court officer's deed to the property described herein. The remaining $30,000 shall be simultaneously transferred to the Estate.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED WITH INSTRUCTIONS.**