# IN THE SUPREME COURT OF IOWA

No. 20–0822

Submitted April 14, 2021—Filed June 4, 2021
Amended August 3, 2021

**JEFFREY LAVERNE WILLIAMS,**

    Appellant,

vs.

**MARK RICHARD BULLOCK** and **SCOTT RICHARD BECKNER,**

    Appellees.

---

Appeal from the Iowa District Court for Johnson County, Andrew B. Chappell, Judge.

State employee appeals district court order annulling writ of certiorari challenging his termination based on violations of Veterans Preference Statute, Iowa Code section 35C.6. **AFFIRMED.**

Waterman, J., delivered the opinion of the court, in which all justices joined.

Skylar J. Limkemann of Smith Mills Schrock Blades, P.C., Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, and Christopher J. Deist, Assistant Attorney General, for appellees.

**WATERMAN, Justice.**

In this appeal, we must decide whether the State complied with Iowa Code section 35C.6 in the Veterans Preference Statute when it terminated the employment of a military veteran from his job as a police officer at the University of Iowa's (UI) Department of Public Safety (DPS). The employee was charged with misconduct after he searched a dorm room without a warrant or consent in violation of DPS policies. He was terminated but later reinstated without back pay following arbitration. Meanwhile, he filed a petition for writ of certiorari in district court alleging violations of section 35C.6 in his initial termination. The State responded, asserting that DPS had complied with section 35C.6. The district court ruled that DPS had complied with section 35C.6 as interpreted in *Kern v. Saydel Community School District*, 637 N.W.2d 157, 161 (Iowa 2001) (allowing flexibility in determining the type of pretermination hearing required under section 35C.6 and relying on posttermination rights to an evidentiary hearing before a neutral arbitrator). The veteran appealed, arguing that *Kern* should be overruled. We retained the case.

On our review, we decline the veteran's invitation to overrule *Kern*, and applying that precedent, we affirm the district court's ruling. The veteran was adequately apprised of the misconduct charges before his pretermination hearing he attended with counsel, and he had a formal postdischarge evidentiary hearing before a neutral arbitrator, thereby satisfying section 35C.6.

## I. Background Facts and Proceedings.

On April 14, 2018, student resident hall assistants (RAs) received multiple complaints about a strong odor of marijuana on the tenth floor of Catlett Hall, the UI's newest and largest dormitory. RAs tracked the smell to a specific room. They contacted their supervisor, professional staff (pro-

staff) member David Jaeger, who joined them at the door. After their repeated knocks went unanswered, he "keyed-in" to unlock the door. Upon entering, they saw in plain view items considered contraband under UI rules: a torch, a bong and pipe used to smoke marijuana, two scales, fake identification and alcoholic beverage containers. They refrained from opening backpacks or closed drawers in the room. They contacted the UI DPS to summon an officer to collect the contraband.

Officer Jeff Williams, a DPS employee, responded to the call from dispatch. He had over seven years of experience in law enforcement. Williams is a military veteran and his supervisors at DPS were aware he was a veteran. Williams had been deployed before and was scheduled to be deployed again in a few weeks. DPS had accommodated his prior deployments and was expected to accommodate his upcoming deployment.

Williams smelled a strong odor of burnt marijuana when he got off the elevator, which grew stronger as he neared the room. Upon entering the room, he smelled both burnt and fresh marijuana. He activated his body camera as he entered, and he recorded by video and audio his activities and conversations in that room.

After the RAs showed him the items they had found, Williams asked them, "So do we think maybe there's anything else or?" Jager responded, "There could be, but per our policy, we're not allowed to open anything, just things that are in the open." Williams stated, "I'm going to open some drawers. I can't charge anybody since you found it anyway." Williams proceeded to open and search desk drawers and backpacks in the room, stating, "Also, I leave for deployment in a few days so if they want to throw a fit over me they—they'll have to wait a while to deal with it." He said, "I just don't want to have to come back here again."

Williams discovered additional contraband, including several bags of marijuana, during the search. He joked with the RAs that they could close the door, wait for them, and say "Surprise!" when the students came back. After referring out loud to his "inappropriate side," he wrote, "I took your weed" on one of his business cards and left it in the drawer where he found the marijuana. Upon finding a locked case cable-locked to the bed frame, Williams said he was considering the "legalities." When the pro-staff member said, "We've never had DPS do a search of their belongings," Williams responded: "I am because they're not here and I just don't want to have to come back." Williams seized the marijuana and drug paraphernalia and asked the RAs to dispose of the other contraband. As Williams left Catlett Hall, he flippantly asked a staff member at the front desk: "Do you need any weed?"

Upon his return to the DPS station, he logged the marijuana and drug paraphernalia into evidence and prepared a report. Williams's initial draft referred to conducting a "search." A supervisor, Nick Jay, altered the report by deleting the word "search" and replacing it with the phrase, "looked around the room" when Williams "located marijuana in the living area of both occupants of the room, as well as a metal marijuana grinder." Jay's revision conflicted with the report from the RAs and pro-staff member stating that Williams "arrived and decided to conduct a search of the room where he opened drawers and backpacks."

The RA report was reviewed under normal residence hall procedures, and Gregory Thompson, the Director of Residence Education in the UI's Housing and Dining Department, emailed Captain Mark Bullock, Williams's superior, on April 19. The email inquired about the April 14 incident and asked Bullock to clarify the DPS policy for a search without consent or a warrant. Bullock reviewed Williams's incident report,

the bodycam video, and the RA report, and then conferred with Lucy Wiederholt, the Chief of the DPS Police Division, for direction on how to proceed. They agreed that a formal administrative investigation was appropriate, and Bullock was assigned to investigate the incident. Chief Wiederholt told Bullock it "could rise to the level of termination if employee and labor relations and human resources supports that." Wiederholt told Bullock that they should take it to Scott Beckner, the DPS Director, who was informed and said he would review the investigation after its conclusion.

That same day, Bullock contacted Shelley Stickfort with Employee and Labor Relations, and he prepared the summary of complaint pursuant to the Peace Officer Bill of Rights in Iowa Code section 80F.1.[1] Bullock retrieved Williams's badge and gun before Williams arrived for his shift. Shortly after Williams arrived, Bullock and Laurie Textor, the Senior Human Resources Director in Finance and Operations, met with him and told him he was being placed on administrative leave pending an investigation into his conduct. Bullock served Williams the summary of complaint and the administrative leave letter. The letter stated: "The reason for the investigation is to obtain information regarding your decisions and actions at Catlett Hall on April 14, 2018." The summary of complaint stated that

> on or about April 14, 2018, you may have performed a warrantless search of Catlett Residence Hall, Room [], without consent. Initial review of this information has led me to believe the search and your conduct during the search or seizure may be in violation of University of Iowa Department of Public Safety Policy and/or University of Iowa Work Rules or Policies.

---

[1]Iowa Code section 80F.1 "provides procedural protections for all police officers facing internal investigations but does not explicitly restrict a city's ability to fire an officer." *Olson v. City of N. Liberty*, 451 F. Supp. 3d 1010, 1031 n.10 (S.D. Iowa 2020).

On April 26, Bullock and Stickfort interviewed Williams, who was represented by counsel. The interview focused on Williams's conduct in the dorm room and took over three hours, including reviewing the body cam video with him. He did not deny any of his statements or conducting the search without a warrant or consent. Williams contended the search fell into a gray area and his conduct was justified from a community caretaking position for the safety of the residents of Catlett Hall.

On May 3, Williams, again represented by counsel, attended a *Loudermill* hearing, where he was informed that the decision-makers were leaning toward termination and gave Williams an opportunity to respond to the allegations. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S. Ct. 1487, 1495 (1985) ("The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement."). Williams read a statement: "I stand by my actions as a police officer and truly thought I was looking out for the well-being of thousands of residents of Catlett Hall that night." Later that day, Williams was terminated.

Williams initiated both this certiorari action and a posttermination grievance procedure. The grievance proceeded to a three-day evidentiary hearing before a neutral arbitrator in August 2019. Multiple witnesses testified, including Williams. The arbitration transcript of approximately 1000 pages was introduced into the record in the certiorari action. On October 31, the district court conducted a daylong evidentiary hearing on the writ and took testimony from Williams, Bullock, and Beckner, among others, and pursuant to the parties' agreement, left the record open for testimony from Chief Wiederholt. Meanwhile, the arbitrator ordered Williams reinstated without back pay, finding the UI lacked "just cause" to terminate him. The State then moved to dismiss the certiorari action

on mootness grounds. The district court reserved ruling on the motion to dismiss and resumed and completed the evidentiary hearing with testimony from Chief Wiederholt on December 11.

On May 5, 2020, the district court issued a twenty-six-page ruling in the certiorari action annulling the writ and dismissing Williams's claims. The district court, noting Williams's claim for back pay, ruled that the case was not moot.[2] On the merits, the district court ruled that the State had proved Williams was guilty of misconduct by "conduct[ing] a warrantless search of two students' residence hall room without their consent" and by behaving unprofessionally while conducting the search. The court noted, "Despite being the authority figure in the room, [Williams] was making jokes, and referring to his inappropriate side." The district court found

> that Williams was not denied his right to a hearing, upon due notice and stated charges, as required by the Veteran's Preference statute. Put another way, the Court finds that the procedures used by DPS satisfied the requirements of Iowa Code Section 35C.6.

Williams appealed, and we retained the case.

**II. Standard of Review.**

We typically review certiorari actions for correction of errors at law. *Noll v. Iowa Dist. Ct. for Muscatine Cnty.*, 919 N.W.2d 232, 234 (Iowa 2018). "Questions of statutory interpretation are reviewed for correction of errors at law." *State v. Wilson*, 941 N.W.2d 579, 584 (Iowa 2020). The parties, however, agree they tried this case in equity by consent. Accordingly, we review the district court's factual findings de novo. *See Passehl Est. v. Passehl*, 712 N.W.2d 408, 414 (Iowa 2006) (applying de novo review to

---

[2]The State does not pursue its mootness argument on appeal, and both sides asked us to retain the case and decide the appeal on the merits. We affirm the district court's ruling that the case is not moot in light of Williams's back pay claim.

equitable actions); *Sille v. Shaffer*, 297 N.W.2d 379, 380–81 (Iowa 1980) ("The trial court announced on the record that the proceedings were equitable and counsel agreed. . . . Since this matter was tried by the court in equity it will be so considered by us and reviewed de novo."). On de novo review, "[b]ecause of the district court's opportunity to evaluate the credibility of witnesses, we will give deference to the factual findings of the district court, but we are not bound by them." *State v. Lowe*, 812 N.W.2d 554, 566 (Iowa 2012).

### III. Analysis.

We must decide whether the district court correctly determined the State complied with Iowa Code section 35C.6 in terminating Williams. We begin with an overview of the enactment. The Iowa Veterans Preference Law provides veterans with certain hiring preferences and workplace protections and was originally enacted in 1904 to aid honorably discharged veterans of the Civil War. *See* 1904 Iowa Acts ch. 9, §§ 1–2 (codified at Iowa Code §§ 1056–a15, 1056–a16 (1907 Supp.)); *Kitterman v. Bd. of Supervisors of Wapello Cnty.*, 137 Iowa 275, 277–78, 115 N.W. 13, 14 (1908). The parties agree that Williams is a veteran entitled to the statute's removal protections. The statute provides:

> No person holding a public position by appointment or employment, and belonging to any of the classes of persons to whom a preference is herein granted, shall be removed from such position or employment *except for incompetency or misconduct shown after a hearing, upon due notice, upon stated charges*, and with the right of such employee or appointee to a review by a writ of certiorari or at such person's election, to judicial review in accordance with the terms of the Iowa administrative procedure Act, chapter 17A, if that is otherwise applicable to their case.

Iowa Code § 35C.6 (2017) (emphasis added). "The Eighth Circuit has construed this statute to create a property interest in employment if the employee falls within purview of the law, which finding in turn mandates

due process procedures." *Glandon v. Keokuk Cnty. Health Ctr.*, 408 F. Supp. 2d 759, 771 (S.D. Iowa 2005) (citing *Winter v. Cerro Gordo Cnty. Conservation Bd.*, 925 F.2d 1069, 1071–72 (8th Cir. 1991)).

"We have recognized that the purpose of section 35C.6 is to [e]nsure veterans permanency of employment and protect them from removal except for their own incompetency or misconduct." *Kern*, 637 N.W.2d at 161. We have previously stated,

> Iowa has recognized the enormous contributions made to our lives by veterans of our armed forces by giving preference to veterans seeking employment with the state, as well as employment with the cities, counties, and school corporations within the state.

*Stammeyer v. Div. of Narcotics Enf't of the Iowa Dep't of Pub. Safety*, 721 N.W.2d 541, 542 (Iowa 2006). Other courts have elaborated that such veterans preference statutes were enacted

> as a form of consideration for society's recognition that (1) veterans generally bring highly valued skills conducive to the better performance of public employment duties, including discipline, experience and service; (2) veterans suffer from a comparative disadvantage relative to non-veterans because of their exclusion from the labor market during their period of military service to the nation; and (3) veterans have rendered the greatest service a citizen can perform namely, the defense of our liberty.

*Blake v. State Civ. Serv. Comm'n.*, 166 A.3d 292, 303 (Pa. 2017) (quoting *Brickhouse v. Spring-Ford Area Sch. Dist.*, 656 A.2d 483, 490 (Pa. 1995) (Castille, J., dissenting)); *see also Feinerman v. Jones*, 356 F. Supp. 252, 259 n.3 (M.D. Pa. 1973) (noting a "fourth motive" for enacting a veterans preference statute is to induce young people to join the military).

We most recently addressed Iowa Code section 35C.6, as it relates to a veteran's termination, in *Kern*, 637 N.W.2d 157. Michael Kern, a veteran of the United States Navy, worked as a custodian for a school district. *Id.* at 158. In his ninth month on the job, Kern's supervisor Merle

Schieffer "met with him and presented him with a written memorandum" detailing problems with his work performance. *Id.* Teachers complained about Kern's assigned areas, and nearly a month later, Schieffer again informed Kern about specific problems and told him "to improve his work performance." *Id.* Kern received a "written work performance appraisal . . . cit[ing] deficiencies in work performance, quality of work, quantity of work, the ability to work with others, job attitude, and dependability." *Id.* That month, Schieffer and the building principal met with Kern to discuss the performance appraisal. *Id.* at 158–59. About seven months later, Kern received written notice that again detailed specific deficiencies his supervisor's inspection found in his work. *Id.* at 159. A meeting was scheduled five days later "to discuss his continued employment . . . [as] step three of the district's procedures for disciplinary action due to poor job performance." *Id.*

Kern and his union representative met with Schieffer and the principal as scheduled. *Id.* Kern was given the opportunity to be heard, and attributed the complaints in part to an excessive workload and the uncleanliness of the teachers and students. *Id.* Schieffer determined Kern "could not be counted on to improve his work performance . . . [that] was not up to district standards." *Id.* He told Kern he intended to recommend termination to the school district superintendent and that Kern would be suspended without pay in the interim. *Id.* at 159–60. Fourteen days later, Kern and his union representative met with the superintendent. *Id.* at 160. Kern "was given the opportunity to review his personnel file, dispute or ask questions about anything in the file, and address any concerns he had." *Id.* The superintendent recommended the school board terminate Kern's employment, and in a meeting without Kern, the board terminated his employment. *Id.*

Kern filed a grievance pursuant to the district's labor contract. *Id.* The district and Kern called witnesses to testify before an arbitrator who "found that the school district did not violate the plaintiff's contractual rights, but, in so ruling, did not consider the requirements of the Veterans Preference Law." *Id.* Kern sued the district for wrongful termination, alleging the district failed "to provide a hearing on his proposed termination as required by . . . Iowa Code § 35C.6 (1997)." *Id.* at 158. The district court entered judgment for the district, and Kern appealed. *Id.*

On our review, we noted that the term "hearing" was not defined in the Veterans Preference statute or relevant caselaw. *Id.* at 160. We quoted an opinion of the state attorney general for guidance on removing a veteran from employment for incompetency or misconduct:

> Written charges should be made stating the grounds for the removal, and a copy of such charges, together with notice of the time and place of hearing, should be served upon the accused, and at such time and place the person sought to be removed should have an opportunity to be heard and refute such charges and show why he ought not to be discharged.
>
> Upon hearing if the charges are not sustained by a preponderance of the evidence the person should be exonerated, but if a preponderance of the evidence shows incompetency or misconduct the person should be removed from his position or discharged from employment.

*Id.* (quoting Op. Iowa Att'y Gen. No. 146 (Dec. 13, 1907), 1907 WL 58272, at *1). We observed that "[i]f the issue before us was whether the opportunity granted this plaintiff to respond to the complaints that led to his discharge satisfied due process, the answer would be easy" because

> [w]hen a formal postdischarge procedure exists in which a discharged employee is afforded a full and complete evidentiary hearing (such as the hearing before the arbitrator provided for in the school district's labor agreement), a predischarge procedure that only calls for a notice of deficient performance and an opportunity to respond will satisfy due process.

*Id.* at 160–61 (citing *Loudermill,* 470 U.S. at 546, 105 S. Ct. at 1495; *Winegar v. Des Moines Indep. Cmty. Sch. Dist.,* 20 F.3d 895, 899 (8th Cir. 1994)). As *Loudermill* elaborated,

> The need for some form of pretermination hearing . . . is evident from a balancing of the competing interests at stake. These are the private interests in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination.

470 U.S. at 542–43, 105 S. Ct. at 1493.

We in turn concluded that "some flexibility is called for in determining the type of predischarge hearing that must be afforded under section 35C.6." *Kern,* 637 N.W.2d at 161. "As is the case with the requirements of the Due Process Clause, the type of hearing required [under section 35C.6] must necessarily vary with the circumstances." *Id.* Noting the purpose of section 35C.6 is to protect veterans "from removal except for their own incompetency or misconduct," we held that

> [b]ecause the school district was aware of plaintiff's postdischarge rights under the collective bargaining agreement, which included a complete evidentiary hearing before an independent arbitrator, we are satisfied the purpose of section 35C.6 was fully satisfied by the type of notice and opportunity to respond that was afforded to plaintiff.

*Id.*

Williams argues we should overrule *Kern* as wrongly decided and that his pretermination rights under section 35C.6 should not depend on his posttermination arbitration rights. *Kern* does not "stand[] for the proposition that a post-termination hearing comports with the statute" as urged by Williams. Rather, the availability of posttermination procedures was one factor we considered in assessing the adequacy of the pretermination process provided in that case. *See id.* at 160–61

(recognizing "some flexibility is called for in determining the type of predischarge hearing that must be afforded under section 35C.6"). To the extent Williams asks us to overturn *Kern*'s reliance on posttermination procedures in assessing the propriety of the pretermination process provided, we apply stare decisis and decline to overrule *Kern*. *See Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 594 (Iowa 2015) ("Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law."). In our view, *Kern* was correctly decided, and no compelling case has been made to overrule it.

When considering what process is required leading up to termination, it makes sense to consider posttermination rights to an evidentiary hearing. Put simply, the risk of an erroneous deprivation of employment rights is mitigated by a posttermination evidentiary hearing that can result in reinstatement. *See Loudermill*, 470 U.S. at 546, 105 S. Ct. at 1495 ("Our holding rests in part on the provisions in Ohio law for a full post-termination hearing."); *Winegar*, 20 F.3d at 901 (noting "the predeprivation procedures might have been adequate if Winegar had been given a meaningful chance to challenge the outcome of those procedures").

The district court correctly applied *Kern*. Williams, like the plaintiff in *Kern*, received a "complete evidentiary hearing before an independent arbitrator" after his termination. *See Kern*, 637 N.W.2d at 161. Indeed, that arbitration resulted in Williams's reinstatement, albeit without back pay. We review the pretermination requirements mindful of the posttermination safeguards. *Id.*; *see also Glandon*, 408 F. Supp. 2d at 772 (holding due process requirements of section 35C.6 unsatisfied because "[t]he five minutes Glandon was allotted *after* his discharge to argue his case for reinstatement before the board of trustees was clearly insufficient as a 'full and complete' postdischarge evidentiary hearing") (emphasis

added). And we reach the same conclusion as the district court—DPS, Beckner, and Bullock did not violate section 35C.6 in the proceedings leading up to Williams's termination.

The statute requires "a hearing, upon due notice, upon stated charges" before removing a veteran from employment for "incompetency or misconduct." Iowa Code § 35C.6. Williams argues he was not provided proper "stated charges" required by the statute. He notes the summary of complaint did not refer to the Veterans Preference statute specifically or the time and place of the hearing. In our view, the document's title or label is not controlling and we decline to elevate form over substance. *Cf. Toney v. Parker*, 958 N.W.2d 202, 209–10 (Iowa 2021) (looking beyond caption to substance of document to determine its legal effect). On April 19, 2018, five days after the dorm room search, Williams was provided the administrative leave letter and summary of complaint. Both referred to his conduct on April 14 at Catlett Hall, with the letter referring to his "decisions and actions" at that time, and the summary of complaint more specifically alleging that he "may have performed a warrantless search of Catlett Residence Hall, Room [], without consent." Williams knew why he was in trouble. He had the opportunity to explain his conduct in his interview, which exceeded three hours, on April 26 and again in his *Loudermill* hearing on May 3, where he read his prepared statement. He had adequate advance notice of his interview and the May 3 hearing. He was represented by counsel throughout this period, and he successfully invoked his posttermination arbitration rights that resulted in his reinstatement. We hold that the flexible procedural requirements of section 35C.6 were satisfied. *See Kern*, 637 N.W.2d at 161. We also affirm the district court's finding that Bullock and Beckner adequately showed Williams guilty of misconduct to support termination under section 35C.6.

**IV. Disposition.**

For the foregoing reasons, we affirm the district court's order annulling the writ.

**AFFIRMED.**