**IN THE COURT OF APPEALS OF IOWA**

No. 21-1213
Filed November 2, 2022

**IN THE MATTER OF THE ESTATE OF HELEN M. HALTER, Deceased.**

**KIM BARBER,**
        Appellant.
_____

        Appeal from the Iowa District Court for Jasper County, John D. Lloyd, Judge.

        Kim Barber appeals an adverse ruling in a probate proceeding.
**AFFIRMED.**

        Joel C. Waters of Kaplan & Frese, LLP, Marshalltown, for appellant

        Hilary J. Montalvo of Nuzum & Montalvo, PLLC, Newton, for appellee.

        Considered by Vaitheswaran, P.J., and Tabor and Badding, JJ.

**BADDING, Judge.**

An estate executor filed an application to determine ownership of the decedent's property, alleging the decedent's half-sister and niece unduly influenced her to add them as joint owners of the decedent's bank accounts. Following a hearing, the district court found the niece had a confidential and fiduciary relationship with the decedent and failed to rebut the presumption of undue influence. Thus, the court determined the bank accounts are the sole property of the estate. The niece appeals that ruling, arguing she met her burden to overcome the presumption of undue influence. We affirm the decision of the district court.

## I. Background Facts and Proceedings

This litigation involves the estate of Helen Halter. Judy Conn is Halter's daughter-in-law, having been married to Halter's son, Bruce, from 1967 until Bruce's death in 1982. Despite Bruce's death and Judy's remarriage to Jeff Conn, she and Halter continued to have a close relationship. Chad Halter, the son of Bruce and Judy, is Halter's only living grandchild. On the other side of the equation are Halter's half-sister, Phyllis Green, and her daughter, Kim Barber.

Halter's long-time attorney, Bruce Nuzum, assisted Halter with her estate-planning needs since the late 1990s. In May 2013, Nuzum helped Halter prepare and execute her last will and testament, a general power of attorney, and a combined living will and medical power of attorney. Halter's will provided for specific bequests of $5000 each to Green, Barber, and a church, with the residue of the estate going into a trust for the benefit of Chad. It also designated Judy as executor, with Jeff serving in her stead if she was unable. The general power of

attorney appointed Judy and Jeff as Halter's attorneys-in-fact with "full power and authority to manage and conduct all of [her] affairs." The living will and medical power of attorney designated Judy as her power of attorney for health care decisions, with Jeff as her successor.

After her husband died in 2010, Halter gradually became more forgetful, less independent, and more susceptible to influence. For example, she needed Judy's assistance with tasks she used to do on her own, and she forgot how to get to places she was familiar with. In 2017 or 2018, Halter's bank noticed that she was spending thousands of dollars per month on magazine orders because she was giving out her bank information to scammers over the phone. She also nearly fell victim to a mailing scam, which Judy learned of and prevented.

Around July 2019, Green learned that Judy was Halter's power of attorney. This upset Green, and she confronted Judy about it. According to Judy's testimony, Green "was adamant that she was going to do something to get me off of there and her on." When Judy asked her, "[W]hat about it do you want?" Green responded, "The money." On September 17, Barber and Green took Halter to Nuzum's law office. According to Barber, Halter told her and Green that she wanted to grant them powers of attorney. Nuzum testified that he met with the trio in the law firm's conference room when they arrived. After he learned they wanted to talk about changing Halter's power of attorney forms and her will, Nuzum asked to speak with Halter alone. According to Shirley, Nuzum's wife and legal assistant, Green and Barber "weren't very happy" when they came back out to the waiting area of the law office.

Nuzum testified that, during his individual visit with Halter, she "was not as responsive as [he] would have liked to have seen." Once they were alone, Nuzum explained to Halter that Judy and Jeff currently served as her agents. He asked Halter if there had been any problems with them, and Halter said there had not been. Ultimately, Nuzum asked Halter whether she wanted to make any changes to her power of attorney, and she responded that she didn't. Nuzum also explained to Halter that her will made specific bequests of $5000 each to Halter's niece, sister, and church, with the residue going into a trust for the benefit of Chad. Halter stated that she did not want to change her will either. She also wanted Judy and Jeff to remain executors under the will.

Nuzum testified that when he and Halter were done with their meeting, Green asked Halter whether she planned to make the changes. When Halter said no, Green's demeanor went from "friendly and outgoing" to "frosty and standoffish." Shirley testified Green and Barber "were very angry," and "they marched out the door." When Nuzum saw the three standing outside the office after they left, Green "seemed to be talking with some force to" Halter, but Halter was withdrawn and not responding. Shirley observed Green and Barber to be scolding Halter like a child.

Sometime the same day, Green was added to Halter's checking and savings accounts with a joint right of survivorship. Troy Garton, the bank's assistant vice president, testified Halter came into the bank with Green. He said Green did most of the talking, and she directed him to not notify Judy of the change to Halter's accounts. Garton did not tell Halter about the implications of giving Green a right of survivorship on the accounts. In the months that followed, Green filled out several checks from Halter's checking account, which Halter signed.

Some were payable to Green and Barber directly, but most of the suspect ones were payable in cash.

About a month later, in October, Halter's long-time primary care physician, Dr. Patrick Edwards, conducted a cognitive assessment of Halter. He opined she had "moderate cognitive impairment," specifically dementia, and she was not "capable of making financial or other legal decisions on her own accord."[1] Dr. Edwards told Judy "that her financial accounts should be monitored as I think she is at high risk for poor decision making of her financial accounts." Judy notified Barber of the diagnosis, but Barber did not agree with it.

On another occasion in October, Judy went to visit Halter at her home, but Halter ended up not being there. When Judy went to the garage to see if Halter's car was there, Green showed up in the driveway, accused Judy of "snooping," and told her to leave. Around the same time, the locks at Halter's home were changed. The check from Halter's account that was written to pay for the lock-changing service was written by Green.

Green returned to her home in Kansas in late 2019 after staying with Halter for several months. Then, in February 2020, Barber was added to Halter's checking account with a joint right of survivorship. Barber testified this was done so she could help Halter out with the account.

On August 10, after a derecho tore through Iowa, Barber picked up Halter from her Newton home and took her to Barber's home in Marshalltown. Barber did not tell Judy that Halter was with her. According to Barber's testimony, Halter

---

[1] Before this evaluation, Judy reported to Nuzum that she had concerns about Halter's capacity. Nuzum suggested that Halter be evaluated by her physician.

"was scared, upset, and she asked [Barber] to come get her." Halter never went back to her home. From then on, Barber controlled who Halter spoke with. Once Judy learned where Halter was at, she was only allowed to speak to Halter once over the phone. Over the course of the next month and a half, several more checks were issued from Halter's checking account payable to Barber or in cash, totaling $1800.

Meanwhile, Barber called her long-time attorney, Kent Geffe, for assistance with Halter's powers of attorney. Geffe met with both Barber and Halter on August 27. He discussed how to terminate a power of attorney and suggested language for doing so, which "Barber wrote down word for word, for them to put in a letter to . . . mail to the people who had knowledge of her power of attorney to terminate it." Barber used that language in a letter to Nuzum's law firm that she drafted and Halter signed, stating that Judy's power of attorney was revoked, effective immediately. Geffe met with Halter again on September 3 to gather information for the new power of attorney. They also discussed updating Halter's will to remove Judy as the designated executor, but that never ended up happening. Halter signed the power of attorney documents at Geffe's office on September 8, naming Barber as agent and Green as successor agent concerning decisions about her property. The instrument specifically revoked any previously executed powers of attorney. While Geffe was informed of Halter's dementia diagnosis, he testified he "saw no signs of any dementia at all."

Halter visited Dr. Edwards again on September 9, this time accompanied by Barber. Dr. Edwards testified at trial that he continued to believe Halter's condition placed her at a risk of being exploited financially. Barber was again

advised of Halter's diagnosis, but Barber disagreed with him. On September 14, 2020, Barber was also added to Halter's savings account with a joint right of survivorship.

After learning her power of attorney had been revoked, Judy petitioned to establish a guardianship and conservatorship over Halter and applied for a temporary injunction. The injunction issued on September 18 and was served on Barber on September 23. The injunction prohibited Barber from engaging in any financial transactions or non-emergency medical decisions of any kind on Halter's behalf until further order of the court. Shortly after Barber was served, a letter was also mailed to Judy's husband notifying him that his power of attorney was revoked.

An attorney was appointed to represent Halter in the guardianship and conservatorship proceeding, and he met with Halter in early October. The attorney testified Halter had trouble tracking the conversation, and she would often repeat herself without knowing it. When discussing her financial matters, Halter reported to the attorney "that she wanted to leave everything the way that it was." She never expressed a desire to give Barber any money.

Halter's sister, Green, passed away in late November 2020 because of complications caused by COVID-19. Halter passed away in early December 2020. Her death certificate listed viral pneumonia caused by a COVID-19-related viral infection as the immediate cause of death, with dementia listed as another significant condition contributing to her death.

A probate petition was filed shortly after Halter's death. Judy was appointed as executor. In that role, she applied for an accounting and other relief in February

2021, including a determination that the bank accounts are estate property. Her application alleged "that Ms. Halter lacked capacity or understanding and/or was coerced, intimidated, or tricked by Ms. Barber into adding her and her mother as co-owners of Ms. Halter's accounts." Following a hearing on the application, Barber agreed that she stood in a confidential or fiduciary relationship with Halter at the times she gained an interest in Halter's accounts. In its ruling, the court agreed, thus triggering presumptions of undue influence and fraudulence of the transfers. The court concluded that Barber failed to meet her burden to rebut those presumptions. As a result, the court ordered that the accounts are the sole property of the estate.[2] Barber appeals.

## II.    Standard of Review

Both parties submit our review is de novo, which would normally be the case for most proceedings in probate, including ones to determine the ownership of property. *See In re Est. of Bates*, 492 N.W.2d 704, 705–06 (Iowa Ct. App. 1992); *In re Est. of Clark*, 357 N.W.2d 34, 37 (Iowa Ct. App. 1984). But here, the district court ruled on objections as they were made—a "hallmark of a law trial." *Passehl Est. v. Passehl*, 712 N.W.2d 408, 414 n.6 (Iowa 2006) (citation omitted). Because no one claims the court improperly excluded evidence, the "court's ruling on objections does not prevent a de novo review." *Id.* We accordingly conduct a de novo review, "under which we give deference to the factual findings of the court

---

[2] The court also ordered Barber to reimburse the estate for a $500 check written to Barber from Halter's account on September 4, 2020, and to return "all items of personal property owned by Helen Halter at the time of her death, including without limitation her purse, wallet, jewelry, jewelry box, and personal documents." Barber does not challenge these aspects of the court's ruling.

but are not bound by them." *See Dix v. Casey's Gen. Stores, Inc.*, 961 N.W.2d 671, 680–81 (Iowa 2021) (quoting *In re Est. of Johnson*, 739 N.W.2d 493, 496 (Iowa 2007)).

## III.    Analysis

"A transfer to a grantee standing in a confidential or a fiduciary relationship to the grantor is presumptively fraudulent and therefore presumptively the product of undue influence." *Mendenhall v. Judy*, 671 N.W.2d 452, 454 (Iowa 2003). Such a transfer is voidable. *In re Est. of Herm*, 284 N.W.2d 191, 200 (Iowa 1979). On appeal, Barber "admits she stood in a confidential and/or fiduciary relationship with" Halter. As a result, "the burden of proof shift[ed] to [Barber] to negate a presumption of undue influence by clear, convincing, and satisfactory evidence." *Mendenhall*, 671 N.W.2d at 455.

Barber argues she met her burden by establishing (1) Halter was not susceptible to undue influence, (2) Barber did not have the opportunity to exercise undue influence and effect a wrongful purpose, (3) Barber did not have the disposition to influence unduly, and (4) the result was not the effect of undue influence. But those elements apply to the establishment of undue influence. *See id.* at 454. Our supreme court has specifically concluded that the elementary criteria for establishing undue influence "provide an unrealistic standard for rebutting the presumption of undue influence that arises from a confidential relationship." *Jackson v. Schrader*, 676 N.W.2d 599, 604 (Iowa 2003). Instead, "the rule for rebutting the presumption of undue influence arising from a confidential relationship . . . requires the grantee of a transaction to prove by clear, satisfactory, and convincing evidence that the grantee acted in good faith

throughout the transaction and the grantor acted freely, intelligently, and voluntarily." *Id.* at 605. "Evidence is clear, convincing, and satisfactory when there is no serious or substantial uncertainty about the conclusion to be drawn from it." *Mendenhall*, 671 N.W.2d at 454. The rebutting party's burden is a heavy one. *Miller v. Eisentrager*, No. 09-0596, 2009 WL 5126118, at *2 (Iowa Ct. App. Dec. 30, 2009).

The district court found Barber did not meet her burden to show she acted in good faith or that Halter acted freely, intelligently, and voluntarily in adding Barber to her accounts with a right of survivorship. Barber does not quibble with either of these findings, as she only argues that she rebutted the existence of the elements necessary for a preliminary finding of undue influence. As noted, that is not the standard for rebutting the presumption of undue influence. Had Barber argued against the court's relevant findings, we have serious and substantial doubts about the correctness of any conclusions that Barber acted in good faith or that Halter acted freely, voluntarily, and intelligently.

The record is filled with evidence that Barber and her mother isolated Halter before obtaining survivorship rights on her accounts and siphoning funds to themselves from those accounts. They hid their actions from Judy, asking the bank to keep their addition to Halter's accounts secret. *See Mendenhall*, 671 N.W.2d at 463 (considering the "stealthy way in which the transfer was made"). This cannot be described as acting in good faith, and Barber did not present any meaningful evidence to the contrary.

What's more, there was no evidence presented by Barber that Halter made the transfers freely, voluntarily, and intelligently. Barber herself testified she was

only added to the accounts to assist Halter with managing them. There was no evidence that Halter intended to provide her with an ownership interest. Indeed, the banker testified that he did not ensure Halter understood that the modification to her accounts would give survivorship rights to Barber and Green. *See In re Est. of Kline*, No. 18-1658, 2019 WL 6358421, at *7 (Iowa Ct. App. Nov. 27, 2019) (noting significance "that there is no evidence that [the transferor] had the benefit of proper independent advice before the transfer of the accounts"). Simply stated, Barber presented no evidence that Halter understood the ramifications of the transactions. *See id.*; *In re Est. of Fink*, No. 04-1306, 2005 WL 1398008, at *3 (Iowa Ct. App. June 15, 2005) (finding transferee failed to meet his burden to show transferor acted freely, voluntarily, and intelligently where transferor did not understand the transaction).

While Barber implies that Halter had the ability to manage her financial affairs, Barber's own testimony, in which she asserted that she had to write checks for Halter and was added to the accounts to help Halter manage them, shows that is not the case. *See Cich v. McLeish*, No. 18-0069, 2019 WL 1056804, at *2 (Iowa Ct. App. Mar. 6, 2019) (finding transferee failed to meet burden where transferor "lacked mental capacity to manage her own affairs"). Finally, the transfers conflicted with Halter's unwavering plan for the disposition of her estate to her only remaining grandson, which bolsters the conclusion that Halter did not understand the transactions.

Because we agree that Barber failed to meet her burden to rebut the presumption of undue influence, we affirm the decision of the district court.

**AFFIRMED.**